Filed 3/18/14  P. v. Suen CA2/2
Opinion following order vacating prior opinion

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B208155 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA316272) |
| v. | |
| DAVID F. SUEN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Norman J. Shapiro, Judge.  Affirmed.

Law Offices of Dennis A. Fischer, Dennis A. Fischer, John M. Bishop, Alan S. Yockelson for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Victoria B. Wilson, Erika D. Jackson and Mark E. Weber, Deputy Attorneys General, for Plaintiff and Respondent.

_____

By letter dated July 31, 2012, this court received the mandate of the Supreme Court of the United States dated June 29, 2012, vacating the judgment filed in this case on November 8, 2010, and remanding the case for further consideration in light of *Williams v. Illinois* (2012) 567 U.S. ____ [132 S.Ct. 2221] (*Williams*). After considering the decision in *Williams* and the parties' responses to our invitation to address its impact on our former opinion, we have concluded that the vacated judgment affirming the defendant's conviction should be reinstated, with the following additional discussion.

## I. Factual and Procedural History

We summarize the pertinent facts, which are fully set out in our now-vacated former opinion. Defendant David Suen was charged with the murder of Ron Emerick, a security guard at the Vanguard nightclub on Hollywood Boulevard. After being escorted from the club due to his degree of intoxication, defendant and a friend, Johnnie Nguyen, both members of the Chinatown Boys gang, tried to convince Emerick to let them back inside. Emerick refused and had them escorted from the premises, whereupon defendant was heard to threaten Emerick. Defendant arranged for a friend, Milton Do, to bring him a gun and bullets, which Do took to defendant, who was waiting outside a restaurant. Do then drove defendant to the Vanguard club in a silver Toyota Corolla belonging to Do's girlfriend. There was no one else in the car. Defendant explained that they were going back to the club "for a security guard."

Do eventually parked the car on the street and defendant got out with the gun. Defendant walked out of sight as he approached the front of the club. Do then heard several gunshots. The doorman saw the shooter fire at Emerick three times, then two more. As he ran away, the shooter fired one final time at Emerick, who died from a gunshot wound to the chest. Defendant ran back to the car. Do and defendant drove off, but Do crashed the car near a freeway onramp. Do and defendant ran. The police eventually found Do and defendant under a freeway overpass. The police found a .357 Magnum pistol with six spent casings in a nearby trash can. Bullet fragments in Emerick's clothing and at the scene were all fired from this gun.

Investigators took DNA samples from the deployed air bags of the crashed car. Erika Jimenez, a DNA analyst with Orchid Cellmark (Cellmark), testified at trial that Do and defendant were both possible donors of the DNA found on the passenger's side air bag. With respect to DNA found on the driver's side air bag, Do was a possible donor, but defendant was excluded as a donor.

Various employees of the Vanguard club identified defendant and Do as persons who were escorted from the club. Defendant was identified as having made threatening statements. The doorman who witnessed Emerick's shooting identified defendant as the driver of the getaway car and Do as the shooter. A witness who saw the car crash saw two males fleeing the car. He saw only one clearly, and he identified him as Asian. He could not identify which man was the driver and which was the passenger.

Although he was untruthful in his statement to police, Do eventually accepted a plea agreement, agreed to testify, and stated he had not previously told the truth because he feared gang retaliation. He testified that he was the driver of the car, defendant was the shooter, and Nguyen was not present.

Defendant testified that Nguyen was escorted from the club due to his conduct, and defendant merely followed. Nguyen had Do pick them up in the car of Do's girlfriend. Nguyen drove, Do sat in the front passenger seat, and defendant got in the back, where he fell asleep. He woke up when he heard gunshots. Do then jumped into the passenger seat, and Nguyen sped away and crashed the car. Do grabbed defendant and told him to run, and then to hide, so that Do would not get caught.

Detective Robert Vargas testified in rebuttal at defendant's trial about certain T-Mobile cell tower location records. He stated that the various tower identification numbers that corresponded to various cell phone calls associated with Nguyen's cell phone number at or near the time of the shooting indicated that those cell towers were in the area of Koreatown. This evidence suggested that Nguyen was not in Hollywood at the time of the shooting.

The jury convicted defendant of the first degree murder of Emerick (Pen. Code, § 187, subd. (a)) and of assault with a firearm on a club patron who was wounded in the

3

leg during the shooting (Pen. Code, § 245, subd. (a)(2)). The jury found "not true" the allegations of personal firearm use by defendant.

Defendant contended on appeal, inter alia, that pursuant to *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305 (*Melendez-Diaz*), his constitutional right to confrontation was violated by: (1) the testimony of a DNA analyst regarding DNA testing by another analyst, and (2) the testimony of a police detective who explained cell tower site records absent explanatory testimony from an employee of the cell phone company.

We affirmed the judgment and distinguished *Melendez-Diaz*. With respect to the DNA evidence, we observed that in *Melendez-Diaz*, the prosecutor introduced affidavits without a witness to support them (*Melendez-Diaz*, *supra*, 557 U.S. at p. 308), whereas in defendant's case, a DNA analyst subject to cross-examination testified in detail about the forensic analysis conducted by others at her company, the quality control maintained, the procedures used, and her expert conclusions. We also drew on the conclusion in *People v Geier* (2007) 41 Cal.4th 555 (*Geier*), and pointed out that the laboratory reports in defendant's case were not testimonial hearsay, but were based on direct observation of test results and constituted "a contemporaneous recordation of observable events rather than the documentation of past events." (*Id*. at p. 605.) Finally, we noted that admission of the DNA lab reports was consistent with the well-established principle that an expert witness "may base an opinion on reliable hearsay, including out-of-court declarations of other persons," citing *In re Fields* (1990) 51 Cal.3d 1063, 1070, *Geier*, *supra*, 41 Cal.4th at page 608, footnote 13, and *People v. Gardeley* (1996) 14 Cal.4th 605, 618.

With respect to evidence of the cell tower records, we concluded that the records were not affidavits or other formalized testimonial materials, but rather business records, citing *Melendez-Diaz*, *supra*, 557 U.S. at page 311, footnote 1. These records were not testimonial even if they were not prepared in the course of equipment maintenance or were not formally deemed a business record exception to the hearsay rule under Evidence Code section 1271.

4

Finally, we concluded that any error regarding admission of the DNA and cell tower evidence was harmless beyond a reasonable doubt because: (1) defendant's defense was undermined by several witnesses, (2) the prosecution's case was supported by substantial evidence, and (3) the witnesses presenting the DNA and cell tower evidence were subjected to cross-examination.

After the United States Supreme Court granted the writ of certiorari and remanded the cause for further consideration in light of *Williams*, we invited counsel to provide supplemental briefing. Defendant now argues that whatever uncertainty has resulted from the Supreme Court's 4-1-4 split in *Williams*, its prior decisions in *Bullcoming v. New Mexico* (2011) 564 U.S. ____ [131 S.Ct. 2705] (*Bullcoming*) and *Melendez- Diaz* are dispositive. In addition, he maintains that the application of the harmless error standard governing federal constitutional error must be reconsidered and the judgment reversed.

## II. Summary of Pertinent Case Law

The confrontation clause of the Sixth Amendment of the United States Constitution provides that "'[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.'" (*Crawford v. Washington* (2004) 541 U.S. 36, 42 (*Crawford*).) The confrontation clause has traditionally barred "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." (*Crawford*, at pp. 53-54.) "Under *Crawford*, the crucial determination about whether the admission of an out-of-court statement violates the confrontation clause is whether the out-of-court statement is testimonial or nontestimonial." (*Geier*, *supra*, 41 Cal.4th at p. 597.)

*Crawford* did not specify what constitutes a testimonial statement for purposes of the confrontation clause, but offered examples of the "[v]arious formulations of this core class of 'testimonial' statements," i.e., "'*ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that

declarants would reasonably expect to be used prosecutorially,' [citation]; 'extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions,' [citation]; [and] 'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial' [citation]." (*Crawford*, *supra*, 541 U.S. at pp. 51-52.)

In a subsequent case, the high court explained that "[s]tatements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." (*Davis v. Washington* (2006) 547 U.S. 813, 822 (*Davis*).)

After the decision in *Davis*, the California Supreme Court was called upon to determine the admissibility of a report detailing DNA testing when the evidence was admitted by means of the testimony of a lab director who cosigned the analyst's report. (*Geier*, *supra*, 41 Cal.4th 555.) In *Geier*, the defendant was convicted of rape and murder based in part on DNA evidence. (*Id.* at pp. 562, 564-565, 593-596.) The laboratory analyst from Cellmark who performed the DNA testing did not testify at trial—a laboratory director who cosigned the report testified instead. (*Id.* at pp. 593-594 & fn. 11, 596.) The laboratory director testified that, based on the test results and in her expert opinion, the DNA extracted from the vaginal swabs matched the victim and defendant.

Through analysis of the case law subsequent to *Crawford*, the *Geier* court recognized the difficulty of the threshold determination of whether evidence is testimonial or nontestimonial. (*Geier*, *supra*, 41 Cal.4th at pp. 597-605.) The court stated it had not found any analysis of the applicability of *Crawford* and *Davis* to the type of scientific evidence at issue in Geier's case to be entirely persuasive. (*Geier*, at p. 605.) Based on its own interpretation of *Crawford* and *Davis*, *Geier* ultimately concluded that

the laboratory reports and notes were nontestimonial and therefore not inadmissible under *Crawford* and *Davis*. (*Geier*, at pp. 605-607.)

Two years later, the United States Supreme Court issued its 5–4 decision in *Melendez-Diaz*, where the trial court had "admitted into evidence affidavits reporting the results of forensic analysis which showed that material seized by the police and connected to the defendant was cocaine. The question presented [was] whether those affidavits are 'testimonial,' rendering the affiants 'witnesses' subject to the defendant's right of confrontation under the Sixth Amendment." (*Melendez-Diaz, supra*, 557 U.S. at p. 307.) The court determined that, since "[t]he 'certificates' are functionally identical to live, in-court testimony" and were made to provide prima facie evidence of the composition, quality, and weight of the analyzed substance, under *Crawford* they were "testimonial statements, and the analysts were 'witnesses' for purposes of the Sixth Amendment." (*Melendez-Diaz*, at pp. 309, 310-311.) The "testimonial" documents were therefore not admissible, because the analysts were not subject to cross-examination and the petitioner had no prior opportunity to cross-examine. (*Id*. at p. 311.)

*Melendez-Diaz* undermined many of the reasons given by the *Geier* court for reaching its conclusion. For example, *Geier* stated that the lab reports were not testimonial because they constituted "a contemporaneous recordation of observable events rather than the documentation of past events," in which the analyst had "recorded her observations regarding the receipt of the DNA samples, her preparation of the samples for analysis, and the results of that analysis as she was actually performing those tasks." (*Geier, supra*, 41 Cal.4th at pp. 605–606.) *Melendez-Diaz* discounted the value of the near-contemporaneous nature of the events reported. (*Melendez-Diaz, supra*, 557 U.S. at pp. 315-316.) *Geier* also determined that the reports were not testimonial because the analyst conducted the tests and made her report contemporaneously, "as part of her job, not in order to incriminate defendant." (*Geier*, at p. 607.) The notes and report were "not themselves accusatory, as DNA analysis can lead to either incriminatory or exculpatory results." (*Ibid*.) *Melendez-Diaz* stated that scientific data are not neutral when they are produced against a defendant, and statements in business records prepared

7

by those whose business activity "is the production of evidence for use at trial" may only be admitted into evidence if subject to the requirements of the confrontation clause. (*Melendez Diaz*, at pp. 321-322.)

In *Bullcoming*, the defendant's blood sample was sent to a state lab for testing after he was arrested for drunk driving. (*Bullcoming*, *supra*, 131 S.Ct. at p. 2709.) The analyst recorded the results on a state form and signed the form, which included a "'certificate of analyst.'" (*Id*. at pp. 2709, 2710.) A reviewer certified that the analyst was qualified and that established procedures had been followed. (*Id*. at p. 2711.) At Bullcoming's trial, the analyst who tested his blood sample did not testify because he had been placed on disciplinary leave. (*Id*. at pp. 2711-2712.) The prosecution called another analyst who was familiar with the lab's testing procedures but had not signed the certification, nor had he participated in, observed, or reviewed the analysis of Bullcoming's sample. (*Id*. at pp. 2710, 2712, 2713.)

The plurality opinion in *Bullcoming* explained that the surrogate analyst was an inadequate substitute for the analyst who performed the test. Surrogate testimony by someone who qualified as an expert regarding the machine used and the lab's procedures could not convey what the actual analyst knew or observed and would not expose "any lapses or lies" by the certifying analyst. (*Bullcoming*, *supra*, 131 S.Ct. at p. 2715.) The court stated that, if the Sixth Amendment is violated, "no substitute procedure can cure the violation." (*Bullcoming*, at p. 2716.)

*Bullcoming* reiterated the principle stated in *Melendez-Diaz* that a document created solely for an evidentiary purpose in aid of a police investigation is testimonial. (*Bullcoming*, *supra*, 131 S.Ct. at p. 2717.) Also, even though the analyst's certificate was not signed under oath, as occurred in *Melendez-Diaz*, the two documents were similar in all material respects. (*Bullcoming*, at p. 2717.)

In *Michigan v. Bryant* (2011) 562 U.S. \_\_\_\_ [131 S.Ct. 1143] (*Bryant*), the United States Supreme Court considered whether admission of a mortally wounded victim's statements to police officers violated the confrontation clause. (*Id.* at p. 1150.) Police officers asked the victim what had happened and who had shot him. The victim

8

identified the defendant and said the shooting had occurred about 25 minutes earlier. (*Ibid.*)  The high court held that the primary purpose of the interrogation was to enable law enforcement to meet an ongoing emergency.  (*Id.* at pp. 1150, 1164.)  In its description of "'ongoing emergency,'" the high court identified several factors that informed the determination of the primary purpose of the questioning, such as the formality of the encounter, and the statements and actions of both the declarant and the interrogator.  (*Id.* at pp. 1160-1161.)  Quoting from *Davis*, *supra*, 547 U.S. at page 822, the United States Supreme Court noted, "[W]e cannot say that a person in [the victim's] situation would have had a 'primary purpose' 'to establish or prove past events potentially relevant to later criminal prosecution.'"  (*Bryant*, at p. 1165.)  Under all of the circumstances of the encounter, the court concluded the victim's identification of the defendant was not testimonial hearsay.  (*Id.* at pp. 1166-1167.)

In *Williams*, the statements at issue were those of a prosecution expert who testified that a DNA profile produced by an outside laboratory, Cellmark, matched a profile produced by the state police laboratory using a sample of the petitioner's blood. (*Williams*, *supra*, 132 S.Ct. at p. 2227.)  A plurality of four justices held in part that, "Out-of-court statements that are related by the expert solely for the purpose of explaining the assumptions on which that opinion rests are not offered for their truth and thus fall outside the scope of the Confrontation Clause."  (*Id.* at p. 2228.)  The plurality offered a second basis for its decision, stating that, even if the report in question had been admitted into evidence, it was not testimonial in that it was not sought for the purpose of obtaining evidence to be used against the petitioner, who was not a suspect at the time. (*Id.* at pp. 2228, 2243.)  The plurality observed that "[t]he abuses that the Court has identified as prompting the adoption of the Confrontation Clause shared the following two characteristics:  (a) they involved out-of-court statements having the primary purpose of accusing a targeted individual of engaging in criminal conduct and (b) they involved formalized statements such as affidavits, depositions, prior testimony, or confessions." (*Id.* at p. 2242.)

9

Justice Thomas joined the four justices of the plurality solely in the judgment. Justice Thomas concluded that the disclosure of Cellmark's out-of-court statements by means of the expert's testimony did not violate the Confrontation Clause for the sole reason that the expert's testimony "lacked the requisite 'formality and solemnity' to be considered 'testimonial' for purposes of the Confrontation Clause." (*Williams*, *supra*, 132 S.Ct. at p. 2255 (conc. opn. of Thomas, J.).)

The remaining four justices joined in a vehement dissent authored by Justice Kagan in which the conclusion that the expert's testimony was not offered for its truth was found to have no merit and was labeled a "prosecutorial dodge." (*Williams*, *supra*, 132 S.Ct. at pp. 2265, 2268 (dis. opn. of Kagan, J.).) Because Justice Thomas also believed that "statements introduced to explain the basis of an expert's opinion are not introduced for a plausible nonhearsay purpose," the dissent asserted that "Five justices specifically reject every aspect of [the plurality's] reasoning and every paragraph of its explication." (*Williams*, at p. 2257 (conc. opn. of Thomas, J.); *id*. at p. 2265 (dis. opn. of Kagan, J.).)

*People v. Lopez* (2012) 55 Cal.4th 569 (*Lopez*) is one of three major cases from the California Supreme Court addressing confrontation clause issues after the *Williams* decision. The others are *People v. Dungo* (2012) 55 Cal.4th 608 (*Dungo*) and *People v. Rutterschmidt* (2012) 55 Cal.4th 650 (*Rutterschmidt*). All three cases, like *Williams*, were concerned with confrontation clause issues engendered by the results of technical reports whose contents were testified to by someone other than the person who conducted the analysis. (See *Lopez*, at p. 573 [laboratory report on blood-alcohol level]; *Dungo*, at p. 612 [autopsy report]; *Rutterschmidt*, at p. 659 [laboratory reports on testing of murder victim's blood samples].)

In *Lopez*, the court found no confrontation clause violation because the critical portions of the report on the defendant's blood-alcohol level "were not made with the requisite degree of formality or solemnity to be considered testimonial." (*Lopez*, *supra*, 55 Cal.4th at pp. 582, 584.) In *Dungo*, there was no confrontation clause violation because "criminal investigation was not the *primary* purpose for the autopsy report's

10

description of the condition of [the victim's] body; it was only one of several purposes." (*Dungo*, *supra*, 55 Cal.4th at p. 621.) The *Rutterschmidt* court set forth the confrontation clause arguments by the Attorney General and defendant but concluded only that any error in allowing the laboratory director to testify to the results of two reports by analysts who did not testify was harmless beyond a reasonable doubt, since the evidence of guilt was overwhelming. (*Rutterschmidt*, *supra*, 55 Cal.4th at pp. 652, 659-661.)

*Lopez* summed up *Williams* by stating, "Although the high court has not agreed on a definition of 'testimonial,' a review of [its] decisions indicates that a statement is testimonial when two critical components are present. [¶] First, to be testimonial the out-of-court statement must have been made with some degree of formality or solemnity. [Citations.] The degree of formality required, however, remains a subject of dispute in the United States Supreme Court. [Citations.] [¶] Second, all nine high court justices agree that an out-of-court statement is testimonial only if its primary purpose pertains in some fashion to a criminal prosecution, but they do not agree on what the statement's primary purpose must be." (*Lopez*, *supra*, 55 Cal.4th at pp. 581-582.)

Justice Liu stated in his dissent to *Lopez* that the nine separate opinions offered by the California Supreme Court in *Lopez*, *Dungo*, and *Rutterschmidt* reflected "the muddled state of current doctrine concerning the Sixth Amendment right of criminal defendants to confront the state's witnesses against them." (*Lopez*, *supra*, 55 Cal.4th at p. 590 (dis. opn. of Liu, J.).) Justice Liu stated that *Williams* produced no authoritative guidance beyond the result reached on its facts. (*Lopez*, at p. 590.) The majority in *Dungo* noted that the complexities of the case were not easy to resolve in light of the widely divergent views of the justices in *Williams*. (*Dungo*, *supra*, 55 Cal.4th at p. 618.) Justice Chin, concurring in *Dungo*, stated that the split among the justices in *Williams* made it "difficult to determine what to make of that decision." (*Dungo*, at p. 628 (conc. opn. of Chin, J.).) He concluded that it was necessary to decide whether there was a confrontation clause violation under Justice Thomas's opinion and whether there was a confrontation clause violation under the plurality's opinion. If there was not, then the result would command the support of a majority of justices in the *Williams* decision.

11

(*Dungo*, at p. 629 (conc. opn. of Chin. J.); see also *People v. Barba* (2013) 215 Cal.App.4th 712, 733-734 (*Barba*) [concluding that Justice Chin's opinion, even if not binding precedent, was persuasive authority and a reliable indicator of how the majority would hold].)

Several districts of the California Courts of Appeal have published decisions applying the line of authority developed by the United States Supreme Court and the California Supreme Court. These decisions include *People v. Huynh* (2012) 212 Cal.App.4th 285 (*Huynh*), *People v. Holmes* (2012) 212 Cal.App.4th 431 (*Holmes*), *People v. Steppe* (2013) 213 Cal.App.4th 1116 (*Steppe*) and *Barba*, *supra*, 215 Cal.App.4th 712.

In *Huynh*, the defendant contended his Sixth Amendment rights were violated when a nurse testified about a victim's sexual assault examination conducted by another nurse. (*Huynh*, *supra*, 212 Cal.App.4th at p. 315.) At issue were two photographs taken during the examination of the victim, which were used by the testifying nurse to state her independent opinion. (*Id*. at p. 320.) The court held that the photographs lacked the formality and solemnity required to be testimonial. (*Ibid*.) In addition, the photographs did not have a primary purpose that pertained in some way to a criminal prosecution, since it was not known at the time of the examination if the drugged victim had been sexually assaulted, and the photographs were not taken for the primary purpose of accusing a targeted individual. (*Id*. at p. 321.) Therefore, the witness's testimony, which stated objective facts she gleaned from the photographs, did not give Hunyh the right to confront and cross-examine the examining nurse. (*Id*. at pp. 320, 321.)

In *Holmes*, *supra*, 212 Cal.App.4th 431, the reviewing court determined that the confrontation clause did not bar testimony by "[t]hree supervising criminalists . . . [who] offered opinions at trial, over defense objection, based on DNA tests that they did not personally perform. They referred to notes, DNA profiles, tables of results, typed summary sheets, and laboratory reports that were prepared by nontestifying analysts. None of these documents was executed under oath. None was admitted into evidence. Each was marked for identification and most were displayed during the testimony. Each

12

of the experts reached his or her own conclusions based, at least in part, upon the data and profiles generated by other analysts." (*Id*. at p. 434.) The *Holmes* court reasoned that these documents were not testimonial because, "[t]he forensic data and reports in this case lack 'formality.' They are unsworn, uncertified records of objective fact. Unsworn statements that 'merely record objective facts' are not sufficiently formal to be testimonial." (*Id*. at p. 438.) *Holmes* concluded, "It is now settled in California that a statement is not testimonial unless both criteria [i.e., formality and primary purpose] are met. In *Lopez*, the court concluded that lack of formality alone rendered the blood-alcohol report nontestimonial regardless of its primary purpose. [Citation.]" (*Holmes*, at p. 438.)

In *Steppe*, *supra*, 213 Cal.App.4th 1116, the appellate court upheld admission of a laboratory technical reviewer's independent opinion that the defendant's DNA profile matched DNA that was retrieved from certain evidence. The testifying witness reviewed the raw data, interpreted it, concluded the victim's DNA was on defendant's clothing, and offered a random match probability opinion. (*Id*. at pp. 1120-1121.) *Steppe* held: "Both *Williams* and *Lopez* persuade us that the trial court's overruling of defendant's objection was not error. There are two aspects of the technical reviewer's testimony that defendant's objection could be viewed as encompassing, i.e., her reference to the raw data and her reference to the conclusion reached by the clothing/door analyst, which was the same as the conclusion she reached. As to the first, *Lopez* specifically held that a machine printout is not subject to confrontation analysis. Here, it was never established how the raw data was generated, or by whom. Defendant cites no authority that testimony concerning raw data, by an expert subject to cross-examination, violates the confrontation clause." (*Steppe*, at p. 1126.) "As to the second aspect, the technical reviewer's reference during her testimony to the conclusion reached by the clothing/door analyst, we note, . . . as a general matter, as both *Williams* and *Lopez* concluded, such lab reports, containing these conclusions, lack the degree of formality and solemnity to be considered testimonial for purposes of the confrontation clause." (*Id*. at pp. 1126-1127.)

13

In *Barba*, *supra*, 215 Cal.App.4th 712, a Cellmark laboratory director, who had not personally done the DNA testing, testified about the results. Her duties included "performing technical reviews of case folders created by the lab's test analysts, independently drawing conclusions from the test results based on her own expertise and training, and either cosigning the reports or testifying about them in court." (*Id*. at p. 718.) *Barba* found no confrontation clause error, stating, "We believe that a majority of [the United States Supreme Court] would approve of an affirmance here for two reasons. Justice Thomas would approve because DNA reports lack the solemnity and formality required to be deemed testimonial. The plurality would approve because, at least as we read the opinion, DNA test reports are not testimonial in part due to practical considerations, and in part because their primary purpose is not to accuse a targeted individual." (*Id*. at p. 742.) The court added, "As for the practical considerations that motivated the plurality in *Williams*, we agree that it makes no sense to exclude evidence of DNA reports if the technicians who conducted the tests do not testify. So long as a qualified expert who is subject to cross-examination conveys an independent opinion about the test results, then evidence about the DNA tests themselves is admissible." (*Ibid*.)

## III. The DNA Evidence

### A. Defendant's Arguments

Defendant points out that this court previously relied upon the *Geier* decision, which was made unsound by the *Lopez* court's recognition of the subsequent disparate conclusions stated in *Melendez-Diaz*. (*Lopez*, *supra*, 55 Cal.4th at pp. 581-582.) Thus, defendant argues, *Lopez* pulled "the precedential rug" from under *Geier*, and a new analysis is called for. He maintains that the statements involved in this case are testimonial under the two-part test indicated in *Crawford*, *Melendez-Diaz*, *Bullcoming* and *Williams*, i.e., that an out-of-court statement is testimonial when made with some degree of formality or solemnity and when its primary purpose pertains in some fashion to a criminal prosecution. (*Lopez*, at p. 582.)

14

### B. DNA Testimony

At the time of trial, Erika Jimenez was a DNA analyst at Cellmark, a DNA testing facility. She received six items for analysis: two swabs from a passenger's air bag, two swabs from a driver's air bag, an oral swab from Do, and an oral swab from defendant. She explained that Cellmark analysts work in teams. People from her team performed the actions she described. She did not physically put the swabs into the tubes. Defense counsel objected on hearsay and lack of foundation grounds.

Upon questioning from the court, Jimenez stated she was not present during testing but had reviewed the entire case file and was positive that everything in "this case" was correct. There were five members of the team. She signed the report with another analyst. Another member inventoried the items and placed them in the tubes. An automation team, separate from Jimenez's "specific" team, performed "the whole DNA process" because it is totally automated. There were three persons on this latter team, two of whom worked on this case. Jimenez testified that only three persons touched the samples.

Jimenez had with her the case file containing all the documents regarding the samples in this case—documents attesting to the inventorying of the evidence through the DNA extraction, quantification, amplification, loading of the samples onto the machine, and the actual profiles, as well as the report and paperwork from the Los Angeles Police Department. Jimenez reviewed all of the documentation before the report was issued and made sure everything had been done correctly and that all of the quality assurance was performed. Jimenez stated that the paperwork documenting the DNA extraction is prepared when the extraction is being performed, and the same is true for the quantification and the generation of the profiles. She had determined that her team followed specific protocols for each step of the process. Jimenez then summarized the standard procedure for obtaining a DNA profile. As part of the standard procedure, the results of the analysis were put into a chart form to make it easy to read. Jimenez testified regarding People's exhibit 70, a chart of alleles, which was viewed by the jury and which was part of her report.

On cross-examination, Jimenez acknowledged that she had not done any of the testing in this case, and she did not see the protocol being followed. She was testifying about what she reviewed in someone else's notes and had formed her opinion on what others wrote, not on her personal knowledge. Jimenez stated that every sample that is run in her lab and every profile obtained is run against every employee in the lab, every employee that worked peripherally at the lab, all visitors to the lab, every DNA profile obtained in the lab, and every other sample that has ever been obtained in the laboratory, as well as all the samples in the same batch. There was no contamination noted in this case.

### C. No Confrontation Clause Violation

We conclude there was no confrontation clause violation with respect to the use of the pages of the report testified to by Jimenez or their admission into evidence. We believe the pages of Jimenez's report were not testimonial because they lacked the requisite degree of formality or solemnity to be considered testimonial. (*Lopez*, *supra*, 55 Cal.4th at p. 582.) There was no showing that the report, of which Jimenez used only pages 3 and 4 in giving her testimony, was a certified or sworn document like the documents in *Melendez-Diaz* and *Bullcoming*.

In *Melendez-Diaz*, "'"the certificates were sworn to before a notary . . .' by the testing analysts who had prepared the certificates. [Citation.] And in *Bullcoming*, the laboratory analyst's certificate regarding the result of his analysis was '"formalized" in a signed document' that expressly referred to court rules providing for the admissibility of such certificates in court. [Citation.]" (*Lopez*, *supra*, 55 Cal.4th at pp. 584-585.) As in *Lopez,* "[s]uch formality is lacking here." (*Ibid*.) There is no evidence before us that the report was "<u>certified</u> by the nontestifying analyst" as defendant claims. Even if the two signatures were considered a certification, as defendant contends, the testifying witness was one of the two signers, and, as far as can be determined, was on an equal basis with the other.

Defendant argues that confrontation clause requirements cannot "'readily be evaded'" by the parties deliberately keeping a written statement informal "'instead of

16

having the declarant sign . . . .'"' (*Bryant*, *supra*, 131 S.Ct. at p. 1160.) Defendant suggests that the jury knew the document was certified, and merely because the prosecution chose to withhold the certification itself would make the right to confrontation easily erasable. (*Bullcoming*, *supra*, 131 S.Ct. at p. 2717.) According to defendant, the fact that the report was signed by "the analyst" sufficed to make it a testimonial statement for Sixth Amendment purposes, and the existence or nonexistence of evidence that it was sworn is of no consequence. He cites *Bullcoming* for the proposition that "'in *Crawford*, this Court rejected as untenable any construction of the Confrontation Clause that would render inadmissible only sworn *ex parte* affidavits, while leaving admission of formal, but unsworn statements "perfectly OK."'" (*Bullcoming*, *supra*, 131 S.Ct. at p. 2717.)

We believe that *Bullcoming*, which defendant elsewhere states is controlling in this case, and *Melendez-Diaz* are distinguishable from the instant case. The forensic laboratory report in *Bullcoming* certified that defendant's blood-alcohol concentration was well above the threshold for aggravated DWI, specifically, 0.21 grams per 100 milliliters. (*Bullcoming*, *supra*, 131 S.Ct. at pp. 2709, 2710.) This certification was made for the purpose of proving a particular fact, and it indeed proved a particular fact that was an element of the defendant's crime. (*Id.* at pp. 2710, 2711.) Likewise in *Melendez-Diaz*, quite apart from the fact that in that case there was no testifying witness at all, the affidavit admitted into evidence stated that the material seized by the police and connected to the defendant was cocaine—thus proving a particular fact that was also an element of the crime. (*Melendez Diaz*, *supra*, 557 U.S. at p. 308.) Not so with DNA analysis, which merely tests samples and shows what alleles can be seen in the samples. The analysis results in this case were not certified and offered as proof of a specific fact that the prosecution was required to prove and attested to by an analyst employed at a state laboratory, as occurred in *Bullcoming* and *Melendez-Diaz*. (See *Bullcoming*, at p. 2710; *Melendez-Diaz*, at p. 308.) DNA analysis does not necessarily prove a defendant's guilt, and it may in fact prove his or her innocence. (See *Williams*, *supra*, 132 S.Ct. at pp. 2228, 2244; *Geier*, *supra*, 41 Cal.4th at p. 607.)

17

The record also fails to support defendant's assumption that the other analyst who signed the report was the analyst who performed the testing and the analyst who should have been called to testify. Nor does the record show that it was "the other analyst" who put the machine data into a chart, as defendant claims. The record also fails to show that the nontestifying analyst prepared the report. We disagree with defendant's assertion that "the record leaves no doubt that the <u>other</u> person who signed the report, certifying it as correct, was the 'somebody else,' namely the analyst who wrote the report after performing the actual analysis." Jimenez merely stated that she signed the report, as did "another analyst," after Jimenez reviewed the case file for D.R. No. 070606252 and "Orchid case No. L.A. 070374." Jimenez determined whether the procedures were followed and quality control was performed. Jimenez's testimony revealed there was no one analyst who performed the test. She stated that she works in a team of five people. One person inventoried the samples and placed them in tubes. The entire DNA process is automated and performed by an automation team that is separate from her team. She later stated that "there were three people that handled the actual samples in this case and two people that signed the report." She did not say whether one of these three handlers was her cosigner on the report, and the testimony suggests that none of the three were, which further indicates defendant is wrong in his assumption. The automation team consists of three people, only two of whom worked on this case. The record thus does not support defendant's claim that there is one person who should have testified instead of Jimenez. Unlike Bullcoming, defendant had an opportunity to cross-examine a live witness who was part of the team that analyzed the DNA results—she was not merely an employee of the same laboratory who was brought in as a surrogate when the expected witness became unavailable, as occurred in *Bullcoming*. (*Bullcoming*, *supra*, 131 S.Ct. at p. 2709.) We simply do not believe Jimenez can be classified as a surrogate witness.

Moreover, Jimenez's testimony showed that the DNA profiles are actually machine-generated data. As stated in *Lopez*, *supra*, 55 Cal.4th at page 583, "[b]ecause, unlike a person, a machine cannot be cross-examined, here the prosecution's introduction into evidence of the machine-generated printouts . . . did not implicate the Sixth

18

Amendment's right to confrontation." Defendant points out, however, that in *Bullcoming* the high court stated that the absent analyst was more than just a scrivener of machine-generated data because he certified that the seal was unbroken, he verified the report number correspondence, and he indicated that he had adhered to a precise protocol. (*Bullcoming*, *supra*, 131 S.Ct. at p. 2714.) Jimenez testified that the proper protocol was followed, and she noted that this was shown by the initials of *various* persons who participated in the process along the way (not one person, as defendant seems to believe). The fact that procedures must be followed along the way in order for a machine to generate data, and the fact that the expert relies on others' notations to verify that procedures were followed does not necessarily corrupt the data that results from an automated process. Although the alleles chart may not be machine-generated in the strict sense, Jimenez did not say how or by whom the chart was generated. She used the passive voice, stating, "When we report the profile, it's put into a chart form to make it easy to read."

Defendant also claims that respondent is disingenuous in relying on *Lopez* and *Dungo* in order to assert that Jimenez gave her own, independent opinion as to the DNA results as an expert using the data in the Cellmark report. Defendant asserts that *Lopez* merely mentions this in passing and it played no part in that case's analysis, and *Dungo* also did not rely on the fact that the expert witness gave his independent opinion. Moreover, defendant states Jimenez made no such assertion and indeed stated that she did not prepare the reports but only reviewed them, and she acknowledged that she did not do any of the testing.

We disagree. *Lopez* noted that the testifying witness, John Willey, after reviewing a laboratory report by a colleague who performed the analysis, voiced his own conclusion, based on his "abilities as a criminal analyst," that the blood-alcohol concentration in the defendant's blood was 0.09 percent. (*Lopez*, *supra*, 55 Cal.4th at p. 574.) *Lopez* concluded that, to the extent that certain notations could be considered testimonial, their admission was harmless beyond a reasonable doubt in light of Willey's independent opinion that defendant's blood sample contained a blood-alcohol

19

concentration of 0.09 percent. (*Id*. at p. 585.) Thus, we see that the value of the testifying witness's independent opinion is not insignificant, since it serves as evidence on a par with the contents of a report prepared by a nontestifying scientist. In *Dungo*, the members of our Supreme Court clearly did not find it insignificant that the testifying pathologist gave only his own independent opinion of the victim's cause of death after reviewing the autopsy report prepared by another pathologist, since the court mentioned this several times. (*Dungo*, *supra*, 55 Cal.4th at pp. 612, 614, 618, 622 (conc. opn. of Werdegar, J.); *id.* at p. at 632, 633 (conc. opn. of Chin, J.).)

In this case, Jimenez clearly testified to her own opinion as an expert by relying on the notes written by other team members during the inventory, extraction, quantification, and other phases of the DNA testing for this case. She said so in court when asked by the defense attorney, i.e., " . . . you are relying on what somebody else wrote and forming your opinion based on that; is that correct?" Jimenez answered, "Yes." This is precisely what expert witnesses do, and such testimony is proper. An expert may generally base his or her opinion on any "matter," personally known or made known to the expert, whether or not admissible, that "is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his [or her] testimony relates . . . ." (Evid. Code, § 801, subd. (b); *People v. Catlin* (2001) 26 Cal.4th 81, 137 [physician may base his or her opinion in part upon the opinion of another physician]); *People v. Montiel* (1993) 5 Cal.4th 877, 918.) It was not necessary for the prosecution to assert that Jimenez had an independent opinion (see *Bullcoming*, *supra*, 131 S.Ct. at p. 2716), since she was plainly called as an expert witness. For example, when asked about defendant's DNA on the passenger air bag, she stated "*I* cannot exclude him from that sample." (Italics added.) She also explained the process of obtaining samples from air bags was based on her own experience. Thus, the results of the DNA testing were used by Jimenez as a basis for her expert opinion, and to the degree that defendant complains that the admitted pages were testimonial, their admission was harmless beyond a reasonable doubt.

We agree with *Barba*, *supra*, 215 Cal.App.4th at page 742, that, "As for the practical considerations that motivated the plurality in *Williams*, . . . it makes no sense to exclude evidence of DNA reports if the technicians who conducted the tests do not testify. So long as a qualified expert who is subject to cross-examination conveys an independent opinion about the test results, then evidence about the DNA tests themselves is admissible." As Jimenez stated when asked if the quality of the testing ultimately depends "on the person that's testing it," her reply was "the quality of the testing depends on everybody in the laboratory working together and doing the right protocol." In his concurrence with the plurality opinion in *Williams*, Justice Breyer discusses the difficulty of determining who might be required to testify regarding DNA test results. As he observed, a dozen or more different laboratory experts might be required for a typical DNA profile comparative analysis, each of whom may make "technical statements" during the analysis that are relied upon by other experts. (*Williams*, *supra*, 132 S.Ct. at p. 2252 (conc. opn. of Breyer, J.).) In *Melendez-Diaz*, the Supreme Court held that in order to satisfy the right to confrontation, not everyone "who laid hands on evidence must be called" as a witness. (*Melendez-Diaz*, *supra*, 557 U.S. at p. 311, fn. 1.) Nothing in the *Williams* decision indicates that this statement from *Melendez-Diaz* was in need of clarification or that it should be rejected. In the instant case, Jimenez testified as an expert, using the work product of a five-person team and a three-person automation team, not all of whom were involved in this particular case. Her involvement was not far removed, unlike the expert witness in *Bullcoming*. The laboratory report in this case is closely analogous to unsworn and uncertified materials that were deemed insufficiently formal to be testimonial in *Williams*, *Lopez*, *Dungo*, *Holmes*, *Steppe* and *Barba*. Following and applying these decisions, we hold that the lab report is not testimonial, and under the circumstances Jimenez described, her testimony, subject to cross-examination, did not violate defendant's confrontation rights.

As stated in *Holmes*: "The California Supreme Court has extracted two critical components from the 'widely divergent' views of the United States Supreme Court justices. [Citations.] To be 'testimonial,' (1) the statement must be 'made with some

21

degree of formality or solemnity,' and (2) its 'primary purpose' must 'pertain[] in some fashion to a criminal prosecution.' [Citations.] [¶] . . . [¶] It is now settled in California that a statement is not testimonial unless both criteria are met." (*Holmes*, *supra*, 212 Cal.App.4th at pp. 437-438.) In the instant case, "[W]e need not consider the primary purpose of [the DNA lab reports] . . . because . . . the critical portions . . . were not made with the requisite degree of formality or solemnity to be considered testimonial [citation]." (*Lopez*, *supra*, 55 Cal.4th at p. 582.)

## IV. Cell Tower Records

### A. *Defendant's Argument*

In our prior opinion, we stated that the cell tower records did not involve, nor were they themselves, affidavits or other formalized testimonial materials, but rather business records. Defendant asserts that this court's 2010 treatment of the issue does not survive the more nuanced approach to the problem required by more recent authority. According to defendant, the developments in decisional law now show that the records' admissibility turns in part on their primary purpose. Defendant contends that our Supreme Court's holdings in *Lopez* and *Dungo* are not controlling on this issue, but rather the decisions in *Melendez-Diaz* and its progeny.

Defendant cites *Melendez-Diaz* for the proposition that a report that otherwise could be said to have been kept in the regular course of a business does not qualify as a business record if it was calculated for use essentially in the court rather than in the business. (*Melendez-Diaz*, *supra*, 557 U.S. at p. 321.) Defendant states that consideration of the primary purpose has become paramount after *Williams*, *supra*, 132 S.Ct. 2221. He argues that the T-Mobile documents are testimonial not only because they purport to certify facts in a formal-appearing manner, but also because their primary purpose was for use at defendant's trial. He asserts that a majority of the *Williams* court, i.e., Justices Scalia, Thomas, Ginsburg, Sotomayor, and Kagan (the four-member dissent and Justice Thomas) would agree with this conclusion. In addition, no T-Mobile witness testified as to how the data was collected, and Detective Vargas admittedly did not know

how and by whom the information was prepared. Thus, the documents were testimonial and subject to the Sixth Amendment's confrontation guarantee.

### B. Proceedings Below

After defendant testified, the prosecutor told the court that she wished to introduce, through Detective Vargas, Nguyen's and Mimi Duong's[1] phone records. The records had been previously given to the defense, but the prosecutor and the detective had not been able to obtain the cell tower sites corresponding with the phone records until that afternoon. The defense had already stipulated to a portion of the phone records—the subscriber information—and had introduced this information in its case-in-chief.[2]

The prosecutor explained that the complete records were about 4,000 pages in length and encompassed all the cell tower sites in the state of California. She and Detective Vargas had "pulled off the cell site records having to do with cell sites that were on Mr. Nguyen's phone records," and wished to introduce only those records. The prosecutor wanted to ask Detective Vargas on the stand to identify the physical location of the pertinent cell tower sites. The defense argued that the records did not appear to be complete, it was late discovery, and there was not sufficient foundation for them. The defense also challenged the detective's qualifications to testify as an expert with regard to the records. After a hearing under Evidence Code section 402, the trial court allowed the prosecutor to present Detective Vargas's testimony.

Detective Vargas took the stand, and the prosecutor introduced People's exhibit 82 consisting of 13 pages. The first page was a legend that assists the reader in understanding the numbers and columns in the succeeding pages. The second page was a copy of a letter from T-Mobile to a Detective Small of Hollywood Homicide stating that

---

[1]     Mimi Duong was Johnnie Nguyen's girlfriend.

[2]     Prior to defendant's testimony, defense counsel, during his case-in-chief, marked two defense exhibits consisting of T-Mobile records for the same two phone numbers contained in pages 2 and 3 of People's exhibit 82. The defense and prosecution stipulated that these records were "the official T-Mobile records as to who the subscriber account name is." Both numbers were ascribed to Mimi Duong.

the information regarding the subscriber of the designated number was being disclosed in response to a search warrant. The third page was the identical letter that referred to a different telephone number. Each letter was signed by the legal compliance agent of law enforcement relations for T-Mobile USA. Pages 4 through 6 consisted of a call summary for the first cell phone number. Pages 7 through 12 were a call summary for the second cell number. These summaries showed the identifying numbers assigned to the cell tower sites for all the calls made on the two cell phone numbers. For each call, the cell tower site identification numbers were shown for the location where a call began and also for where the call ended. The last page of exhibit 82, page 13, was a typed chart showing the street address and city corresponding to the cell tower site identifications numbers.

Detective Vargas explained the meaning of the columns on the call summaries and the use of the legend to understand the succeeding pages. He explained that he had previously received cell tower site information with confusing or invalid identification reference numbers. That very day he had telephoned T-Mobile and requested some additional information. He testified that the last page, page 13 of exhibit 82, was a modified list of cell tower locations that corresponded to the five-digit cell tower identification numbers. The trial court overruled the defense objection to the testimony on the bases of hearsay and lack of expertise. The prosecutor then questioned Detective Vargas on his background and experience with cell phone records.

Detective Vargas explained that he put together page 13 by using the five-digit reference number for the cell tower location on the 4,000-page list of cell tower locations and then using the "control F" function on a computer to locate the address that corresponded with the five-digit number. He and the prosecutor cut and pasted to make the modified list of the numbers that were important for the current investigation. Detective Vargas testified that the second phone number, which showed Mimi Duong as the subscriber, was previously identified by other witnesses[3] at trial as belonging to

---

[3]    During his testimony, defendant stated that the last four digits of Nguyen's cell phone number were 4038.

24

Johnnie Nguyen.  The prosecutor and Detective Vargas focused on the 27th of January from the hours of 12:30 to 3:00 a.m.  Detective Vargas explained to the jury the area of the city where the street addresses corresponding to the pertinent cell towers were located.  He gained his knowledge of these areas while working in all of them.  He also pointed to the areas on a map.

On cross-examination, Detective Vargas acknowledged that he was not trained by T-Mobile to interpret their records, and he had never qualified as an expert in court on T-Mobile records.  He did not know "what T-Mobile did" to prepare the records he received.  He acknowledged that T-Mobile used the same cell tower site numbers for Northern and Southern California sites, and he deduced or speculated that this was because they only had five digits to work with.  He knew that Verizon cell tower sites covered a one-mile radius from the site but did not know the coverage for T-Mobile.

On redirect, Detective Vargas stated that a Ms. Johnson of T-Mobile explained to him how to use the "control F" function for the five-digit identification number that corresponded to the cell tower site address and to press "next" if he was first shown a Northern California site.  Based on witness statements and phone records and the fact that the incident was a Southern California incident he checked only the Southern California sites.

At sidebar, the defense objected to exhibit 82, the maps, and the entire testimony on the basis of hearsay.  The trial court admitted the testimony and exhibits over the defense objection.

### C. No Confrontation Clause Violation

Even if the cell tower site records were to be considered hearsay, we conclude that their use by Detective Vargas did not violate defendant's Sixth Amendment rights.  "'Not all erroneous admissions of hearsay violate the confrontation clause. . . .  Only the admission of *testimonial* hearsay statements violates the confrontation clause . . . .' [Citations.]" (*People v. Loy* (2011) 52 Cal.4th 46, 66.)

The records of cell tower sites generated by T-Mobile were not testimonial.  They were not sworn documents, despite defendant's claims that the letters in exhibit 82 from

25

the T-Mobile legal compliance agent served to certify the accuracy of the information supplied to law enforcement. The letters from the legal office state only: "This is in response to the Search warrant, dated February 23, 2007, and served upon T-Mobile USA on February 26, 2007. This subpoena requests customer identification/account information and Call Detail Records from the T-Mobile USA subscriber assigned mobile telephone number [number]. [¶] A search of our subscriber database discloses the following information: . . ." This is followed by the subscriber's name, account number, date of birth, and other personal data. The letters clearly did not certify the accuracy of the information, but merely the reason they were being provided. Therefore, the information was not testimonial.

With respect to the primary-purpose prong, defendant argues that it is incontestable that the T-Mobile documents were prepared to serve as evidence in defendant's criminal trial. Thus, the majority of justices who signed opinions in *Williams* would have found them testimonial. In Justice Kagan's dissenting opinion, defendant points out, the justice found the statements at issue in *Williams* testimonial "because the report is, in every conceivable respect, a statement meant to serve as evidence in a potential criminal trial. And that simple fact should be sufficient to resolve the question." (*Williams*, *supra*, 132 S.Ct. at p. 2275 (dis. opn. of Kagan, J.).) And, unlike the autopsy reports in *Dungo*, defendant argues, the T-Mobile report was introduced into evidence and Detective Vargas described its contents in his testimony. (*Dungo*, *supra*, 55 Cal.4th at pp. 618-619.)

The record indicates that the 4,000-page list of cell tower sites did not have as its primary purpose the use of the information in a criminal prosecution, but rather that it was merely what it purported to be—documents kept in the regular course of business listing all of T-Mobile's cell tower sites in California. And, the "regularly conducted business activity" was not "the production of evidence for use at trial." (*Melendez-Diaz*, *supra*, 557 U.S. at p. 321.) Unlike the certificate in *Melendez-Diaz*, the cell tower list was not "'calculated for use essentially in the court, not in the business.'" (*Ibid.*, citing *Palmer v. Hoffman* (1943) 318 U.S. 109, 114.) The list clearly did not have the primary

26

purpose of accusing defendant of a crime. The same analysis applies to the call details for the two phone numbers, which were prepared on February 26, 2007, upon the serving of the subpoena. Although, unlike the autopsy reports in *Dungo*, portions of the T-Mobile list were introduced into evidence, and Detective Vargas described the list's contents, he did not describe any *conclusions* in the document, which was the critical point in *Dungo*. (*Dungo*, *supra*, 55 Cal.4th at pp. 618-619.) Of course, there were no conclusions to describe, since the contents consisted of merely a list.

Detective Vargas testified that the last page of exhibit 82 was prepared by him and the prosecutor for use at trial. This page listed the street addresses, cities, and general area of the cell towers used by the two phone numbers in question. Thus, this page clearly had as its primary purpose the contradiction of defendant's testimony. This page contained no certification, however, and Detective Vargas was subject to cross-examination regarding his and the prosecutor's method of preparation of this page. Therefore, with respect to the cell tower site records, neither prong of the test was satisfied, and there was no confrontation clause violation. (*Holmes*, *supra*, 212 Cal.App.4th p. 438 [in order to be testimonial, statements must have some degree of formality and have a primary purpose that pertains to a criminal prosecution].)

## V. Harmless Error

In any event, we conclude that, even if defendant's right of confrontation under the Sixth Amendment was violated because of Jimenez's and Vargas's testimony based on the reports in question, any error was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*).) We note that, according to defendant, our conclusion in the 2010 opinion—that any Sixth Amendment error was harmless because the case against defendant was "compelling"—incorrectly inverted the *Chapman* standard by placing the burden on the defendant to demonstrate harmlessness. Defendant states that, although it was not wrong for this court to take notice of the respective strengths of the prosecution and defense cases, the purpose of harmless error review is not for the reviewing court to "'become in effect a second jury to determine whether the defendant is guilty,'" but instead to determine whether the error had any likelihood of

affecting the result of the trial. (*Neder v. United States* (1999) 527 U.S. 1, 19.) Defendant asserts that it is not faithful to *Chapman*'s recognition of the fact that "[a]n error in admitting plainly relevant evidence which possibly influenced the jury adversely to a litigant cannot . . . be conceived of as harmless." (*Chapman*, *supra*, 386 U.S. at pp. 23-24.)

With respect to the testimony by Jimenez and Detective Vargas, the trial court instructed the jury members that they should consider the qualifications and believability of any expert witness, the facts or materials upon which the opinions are based, and the reasons for each opinion. The jury was told it was not bound by an opinion and might disregard any opinion it found unreasonable. (CALJIC No. 2.80.) Both witnesses were extensively cross-examined by the defense as to their personal knowledge and involvement in obtaining the information on which their testimony was based.

We also agree with the reasoning of *Barba* that, even if the reports should not have been admitted into evidence, the reports were meaningless without the testimony of Jimenez and Detective Vargas. (See *Barba*, *supra*, 215 Cal.App.4th at p. 743.) And, if the reports on which Jimenez and Detective Vargas relied had not been admitted into evidence, their testimony would remain. (*Ibid*.)

Moreover, the jury clearly found that defendant's testimony about Nguyen's involvement was not credible. Testimony from Do contradicted defendant's story and was apparently credited by the jury. Do testified that only he and defendant drove to the club, and only he and defendant were in the car when it left the club, and defendant was the passenger and shooter. The fact that the jury found "not true" the enhancements charging defendant with use of a firearm indicates that they believed the prosecution had not proved beyond a reasonable doubt that it was defendant who fired the gun. It may have been the testimony of the witness who repeatedly identified defendant as the driver of the getaway car and Do as the shooter that created reasonable doubt on this point. Do's girlfriend, Cindy Nguyen, testified that Do left the restaurant parking lot with defendant in her car. Do was driving and defendant was sitting in the passenger seat. She stated that she and several other people were passengers in defendant's car driven by

28

Nguyen. Nguyen drove them to a karaoke bar in Koreatown. In addition, a bystander who saw the car crash near the freeway testified that only two Asian males got out of the car. One was in the driver's seat and the other in the front passenger seat. Another witness testified that he saw two light-skinned males hiding in the bushes where there was an opening in a fence while a helicopter flew overhead, which corroborated Do's account.

We believe that admission of the DNA testimony by Jimenez and the cell tower testimony by Detective Vargas had no likelihood of affecting the result of defendant's trial. That is to say, we believe it unlikely the jury would have acquitted defendant or that there would have been a deadlock. Accordingly, defendant's argument that his conviction must be reversed because his Sixth Amendment rights were violated is rejected.

## DISPOSITION

The judgment is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


BOREN, P.J.

We concur:


ASHMANN-GERST, J.


CHAVEZ, J.