[No. E053348. Fourth Dist., Div. Two. Feb. 14, 2013.]

THE PEOPLE, Plaintiff and Respondent, v.
BERNARD ALBERT STEPPE, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.110, this opinion is certified for publication with the exception of parts 2. and 3.

**COUNSEL**

Philip M. Brooks, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Lynne G. McGinnis and Kristine A. Gutierrez, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**RAMIREZ, P. J.**—A jury convicted defendant, Bernard Albert Steppe, of second degree murder (Pen. Code, § 187, subd. (a)),[1] during which he discharged a firearm causing death (§ 12022.53, subd. (d)), discharged a firearm (§ 12022.53, subd. (c)) and used a firearm (§§ 12022.53, subd. (b), 12022.5, subd. (a)). The jury also convicted defendant of attempted murder (§§ 664, 187, subd. (a)), during which he discharged a firearm causing great bodily injury (§ 12022.53, subd. (d)), discharged a firearm and used a firearm. He was sentenced to prison for two 25-year-to-life terms and one 15-year-to-life term, plus nine years. He appeals, claiming the admission of certain DNA analysis evidence violated his right to confrontation, he was improperly denied discovery and a juror should have been excused. We reject his contentions and affirm, while directing the trial court to correct errors appearing in both abstracts of judgment.

### FACTS

During a 911 call on January 8, 2007, the attempted murder victim was heard to say that he and others had been shot by defendant, after the latter threatened to kill "all of [them]" and two of them were "down." In the background, the murder victim could be heard asking for help and saying he was going to die. Bullets had been fired into the front and back doors of a building which housed the attempted murder victim's law office. The attempted murder victim told arriving police that defendant had shot him, the murder victim and a female. Defendant had worked as the attempted murder victim's paralegal and he was living at the next-door bail bonds building rent free. The female and the attempted murder victim had been in the latter's office, cleaning, and the murder victim had been hired by the new owner of the building to help clean. Defendant, who was being evicted from the bail bonds building, came to the door of the next-door building with a gun, waved it at all of them, pointed it at the murder victim and said he was going to shoot him. The murder victim and the attempted murder victim closed the door, but were shot by defendant in the process. The murder victim had been shot in the chest, the attempted murder victim in the lower right abdomen and on the left side of his face and the female in the thigh. Police followed out into the desert fresh shoe tracks from the building from whence defendant had been evicted. There were indicators that a person had gone down on his or her hands and knees and disturbed the dirt. A gun with seven expended shell casings inside was found buried in this area. The police stopped a car being driven by defendant nearby. As the police approached the car, defendant said, "You caught me." There were what appeared to be blood splatters on defendant's hands and jacket. The soles of the shoes he wore resembled the

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

tracks that had been seen in the desert. On the way to jail, defendant said that he had "reloaded." There were seven expended .22-caliber shell casings in his pants pocket, which had been fired from the buried gun. Upon the police discovering them, defendant reiterated, "I reloaded." The bullet removed from the murder victim could have been fired from that gun. Defendant had gunshot residue on his hands. Blood with DNA matching the murder victim's was found on defendant's hand and his clothing. DNA matching the murder victim's and defendant's was also on the grip of the gun.

Defendant testified that he shot the attempted murder victim in self-defense and he denied inflicting the fatal shot to the murder victim and shooting the female. He claimed that he buried $5,000 in the desert, but not the gun, so the police must have dug up the money and replaced it with the gun.

### ISSUES AND DISCUSSION

1. *Admission of DNA Analysis and Defendant's Right to Confrontation*

A DNA analyst for the San Bernardino County Crime Lab testified in general about DNA testing. She testified that analysts in the lab "obtain DNA typing results that have a numerical value from [items at the crime scene] and we compare those numerical results [with those taken from individuals present at the crime scene]. They either are the same or they are different." She also testified that "chemicals and reagents . . . are used during the analysis" and the analyst "performs the actual extraction [of the DNA] and DNA typing analysis and comes to interpretation, conclusion, and writes a report." However, neither she nor any other DNA analyst testified about the method by which the raw data used by analysts to conclude that there was a match was obtained—whether this raw data was computer generated[2] or the

---

[2] At one point during her testimony, she said she "look[ed] at the data on the computer . . . . [¶] . . . [¶] . . . I have here in front of me . . . an electropherogram. It is a computer printout of the actual DNA data the DNA typing profile." We note with interest that in his opening brief, defendant states that "the raw data [is] collected from a genetic analyzer" and "the raw data [is] generated by the machine . . . ." Thus, defendant attempts to school this court in how DNA testing is done and what inaccuracies can occur in the process. His efforts are in vain. The time to introduce these facts was below, when the objection was made to the trial court. We cannot conclude that the trial court erred in overruling defendant's objection based on facts not disclosed to it. Additionally, we note that defendant failed to cross-examine the analyst below about these potential inaccuracies, thereby waiving the matter.

We also note that *Williams v. Illinois* has a solution for the problems of inaccuracy defendant addresses: "[R]equiring that the lab analyst or analysts who produced the DNA profile be called as prosecution witnesses is neither sufficient nor necessary to prevent such errors. Since samples may be mixed up or contaminated at many points along the way from a crime scene to the lab, calling one or more lab analysts will not necessarily catch all such mistakes. . . . What is needed is for the trier of fact to make sure that the evidence, whether direct or circumstantial, rules out the possibility of such mistakes at every step along the way. And in the usual

product of work by the analyst or by the analyst with the assistance of coworkers or by a coworker.[3] She went on to testify that after the report is written, "that whole file is given on to a second qualified individual who reviews the raw data and comes to their own conclusions based on the results, and they must agree [with the first analyst] before th[e first analyst's] report leaves the building." She testified, inter alia, to the analysis she arrived at regarding the DNA of the people at the scene of the crimes, including defendant. Hereafter, she will be referred to as the people analyst.

The technical reviewer of the DNA analysis done on bloodstains and suspected bloodstains found on defendant's clothing and on a door at the crime scene testified that her job was to "review . . . all the notes, data, and the report of the DNA analyst and . . . ensure that the results are accurate and the conclusions are appropriate for th[e] items [tested]. It also includes doing an independent analysis of the data and interpretation and arriving at results and then comparing those results to the analyst's results to . . . ensure that it is accurate and the conclusions are appropriate for those items." She testified that she was the technical reviewer for the analyst who analyzed the bloodstains and suspected bloodstains on defendant's clothing and the door. She was asked if she reviewed all of the clothing/door analyst's raw data regarding those items and she said she did.[4] When she was asked if she compared the first such stain to the DNA analysis performed by the people analyst, defendant, who was representing himself, objected as follows, "I have a right to confront [the clothing/door analyst] and I am objecting to th[e technical reviewer] saying anything about [that analyst's] work. I have a right to have confrontation with [the clothing/door analyst] about anything she did, the facts that she reviewed." The trial court overruled the objection. Thereafter, the technical reviewer was asked whether she "looked at . . . [the] raw data [for the first bloodstain from defendant's clothing]" and was able to make a comparison between that and the [DNA profiles made by the people analyst] . . . ." She replied, ". . . I interpreted the raw data and drew, interpreted, and arrived at the . . . results that are listed along the top [of a DNA table introduced into evidence called 'STR-DNA Analysis Results.']." She went on to testify, as is relevant here, that it was *her* conclusion, looking at the raw data, that the murder victim was the major donor of DNA to

course of authentication, defense counsel will have access to sufficient information to inquire into, question, or challenge the procedures used by a laboratory if this seems to be a prudent and productive strategy." (*Williams v. Illinois* (2012) 567 U.S. ___, ___, fn. 12 [183 L.Ed.2d 89, 132 S.Ct. 2221, 2241, fn. 12] (*Williams*).)

[3] See text on page 1120, *post.*

[4] Although in response to the prosecutor's question to the technical reviewer, "You reviewed all of [the clothing/door analyst's] raw data?" the technical reviewer said, "Yes," she later testified concerning one of the stains on the door, after reviewing the raw data she had with her at trial, that she noted she did not "review[] the [clothing/door analyst's] raw data" at that moment. Of course, this suggests that each was working off an independent set of raw data.

suspected bloodstains on defendant's T-shirt and was the only donor of DNA to a bloodstain and a suspected bloodstain on defendant's jacket and she added the statistical probabilities that someone other than the murder victim could have the same DNA. Additionally, two of the suspected bloodstains on the door matched the murder victim's DNA[5] and for a third, he was a major donor.[6] She was asked, "[W]hen you conducted and did your independent analysis of the raw data, can you compare your results to [the clothing/door analyst]'s results?" She replied that she could and "the conclusions were exactly the results that I stated here. They have to be consistent and that is the point of the tech[nical] review. I have to insure it is accurate and we are agreed upon in terms of the same result or similar result and the same conclusion." She added that she and the clothing/door analyst's results were the same for each item. The clothing/door analyst's report was not shown to the jury nor admitted into evidence and there is nothing in the record to suggest that the STR-DNA analysis results pages referred to by the technical reviewer throughout her testimony and admitted into evidence were generated by the clothing/door analyst. Defendant here contends that the trial court erred in overruling his confrontation clause objection to the technical reviewer's testimony. We disagree.

After the parties fully briefed this case, the United States Supreme Court decided *Williams*. In *Williams*,[7] the issues were whether ". . . *Crawford* bar[s] an expert from expressing an opinion based on facts about a case that have been made known to the expert but about which the expert is not competent to testify . . ." or " 'the constitutionality of allowing an expert witness to discuss others' testimonial statements if the testimonial statements were not themselves admitted as evidence.' [Citation.]" (*Williams, supra,* 567 U.S. at pp. ___, ___ [132 S.Ct. at pp. 2227, 2233].) "The . . . report [of the outside lab] itself was neither admitted into evidence nor shown to the [judge in a

---

[5] As to the match for one, she testified, "I am referring to my report, [the clothing/door analyst's] report."

[6] She also testified that DNA from the victim of the count of attempted murder for which defendant was acquitted was found in a suspected bloodstain on the door and for one of the other suspected bloodstains on the door, the attempted murder victim could not be excluded as a minor donor. However, because defendant was acquitted of attempting to murder the former victim and he claimed to have shot the latter victim in self-defense we do not include these results in our discussion because they could not possibly have prejudiced defendant.

[7] During oral argument, appellate counsel for defendant asserted that we should not rely on the holdings in *Williams* because, he contended, five justices disagreed with it. We note, however, that the fifth justice, Justice Thomas, concurred in the judgment because, he concluded, the report lacked the formality requisite to be considered testimonial for confrontation clause purposes, a position we reach in this case. (*Williams, supra,* 567 U.S. at p. ___ [132 S.Ct. at p. 2255] (conc. opn. of Thomas, J.).)

bench trial]. [The expert] did not quote or read from the report; nor did she identify it as the source of any of the opinions she expressed." (*Id.* at p. ___ [132 S.Ct. at p. 2230].)

■ As is pertinent to our discussion, the high court held, "Even if the [outside lab's] report had been introduced for its truth, we would nevertheless conclude that there was no Confrontation Clause violation. . . . [¶] The abuses that the Court has identified as prompting the adoption of the Confrontation Clause shared the following two characteristics: (a) they involved out-of-court statements having the primary purpose of accusing a targeted individual of engaging in criminal conduct and (b) they involved formalized statements such as affidavits, depositions, prior testimony, or confessions. In all but one of the post-*Crawford* cases in which a Confrontation Clause violation has been found, both of these characteristics were present. [Citations.][8] . . . [¶] . . . In [*Michigan v.*] *Bryant* [(2011) 562 U.S. ___ [179 L.Ed.2d 93, 131 S.Ct. 1143] . . . we explained that a person who makes a statement to resolve an ongoing emergency is not acting like a trial witness because the declarant's purpose is not to provide a solemn declaration for use at trial . . . . [Citation.] We noted that 'the prospect of fabrication . . . is presumably significantly diminished' when a statement is made under such circumstances [citation] and that reliability is a salient characteristic of a statement that falls outside the reach of the Confrontation Clause [citation]. We emphasized that if a statement is not made for 'the primary purpose of creating an out-of-court substitute for trial testimony,' its admissibility 'is the concern of state and federal rules of evidence, not the Confrontation Clause.' [Citation.] [¶] In *Melendez-Diaz* and *Bullcoming*, the Court held that the particular forensic reports at issue qualified as testimonial statements, but the Court did not hold that all forensic reports fall into the same category. Introduction of the reports in those cases ran afoul of the Confrontation Clause because they were the equivalent of affidavits made for the purpose of proving the guilt of a particular criminal defendant at trial. . . . [¶] The [outside lab] report [here] is very different [than the forensic reports in *Melendez-Diaz* and *Bullcoming*]. It plainly was not prepared for the primary purpose of accusing a targeted individual. In identifying the primary purpose of an out-of-court statement, we apply an objective test. [Citation.] We look for the primary purpose that a reasonable person would have ascribed to the statement, taking into account all of the surrounding circumstances. [Citation.]"9 (*Williams, supra*, 567 U.S. at pp. ___–___ [132 S.Ct. at pp. 2242–2243], fns. omitted.) "When lab

---

[8] Thus, defendant's assertion, during oral argument, that both factors must be present is unfounded. Additionally, the California Supreme Court in *People v. Lopez* (2012) 55 Cal.4th 569, 582 [147 Cal.Rptr.3d 559, 286 P.3d 469] (*Lopez*) relied only on the formality factor, concluding it did not need to determine whether the primary purpose factor was present.

[9] For the sake of thoroughness, the DNA testing of the semen in the vagina swabs occurred first, then the results were placed in a state DNA database, which contained the defendant's DNA results from a previous case, and the computer showed a match between the two. (*Williams, supra*, 567 U.S. at p. ___ [132 S.Ct. at p. 2229].) The Supreme Court noted,

technicians are asked to work on the production of a DNA profile, they often have no idea what the consequences of their work will be. In some cases, a DNA profile may provide powerful incriminating evidence against a person who is identified either before or after the profile is completed. But in others, the primary effect of the profile is to exonerate a suspect who has been charged or is under investigation. The technicians who prepare a DNA profile generally have no way of knowing whether it will turn out to be incriminating or exonerating—or both. [¶] It is also significant that in many labs, numerous technicians work on each DNA profile. [Citations.] When the work of a lab is divided up in such a way, it is likely that the sole purpose of each technician is simply to perform his or her task in accordance with accepted procedures. [¶] Finally, the knowledge that defects in a DNA profile may often be detected from the profile itself provides a further safeguard." (*Williams, supra*, at p. ___ [132 S.Ct. at p. 2244].) "If DNA profiles could not be introduced without calling the technicians who participated in the preparation of the profile, economic pressures would encourage prosecutors to forego DNA testing and rely instead on older forms of evidence . . . that are less reliable. [Citation.] The Confrontation Clause does not mandate such an undesirable development. This conclusion will not prejudice any defendant who really wishes to probe the reliability of the DNA testing done in a particular case because those who participated in the testing may always be subpoenaed by the defense and questioned at trial." (*Williams, supra*, at p. ___ [132 S.Ct. at p. 2228].) ▮ "In short, the use at trial of a DNA report prepared by a modern, accredited laboratory 'bears little if any resemblance to the historical practices that the Confrontation Clause aimed to eliminate.' (*Bryant, supra*, . . . [at p. 1167] (Thomas, J., concurring [Justice Thomas concluded that the statements at issue 'lacked sufficient formality and solemnity . . . to be considered "testimonial." ']).)" (*Williams*, at p. ___ [132 S.Ct. at p. 2244].)[10]

"[T]he primary purpose of the [outside lab's] report, viewed objectively, was not to accuse [the defendant] or to create evidence for use at trial. When the [vaginal swabs were] sent . . . to [the outside lab], its primary purpose was to catch a dangerous rapist who was still at large, not to obtain evidence for use against [the defendant], who was neither in custody nor under suspicion at that time. [N]o one at [the outside lab] could have possibly known that the profile that it produced would turn out to inculpate [the defendant] . . . . Under these circumstances, there was no 'prospect of fabrication' and no incentive to produce anything other than a scientifically sound and reliable profile. [Citation.]" (*Id.* at pp. ___, ___ [132 S.Ct. at pp. 2243, 2244].)

[10] In *People v. Geier* (2007) 41 Cal.4th 555 [61 Cal.Rptr.3d 580, 161 P.3d 104], the defendant claimed that his right to confrontation was violated by the testimony of the prosecution's DNA expert that was based on testing she did not, herself, conduct, and on her review of another analyst's report. The California Supreme Court rejected the defendant's claim that the analyst's report was a testimonial statement, saying, "[The analyst's] observations [in the report] . . . constitute a contemporaneous recordation of observable events rather than the documentation of past events." (*Id.* at p. 605.) "As we read *Davis* [*v. Washington* (2006) 547 U.S. 813 [165 L.Ed.2d 224, 126 S.Ct. 2266]], the crucial point is whether the statement

Contrasting *Williams* with *Melendez-Diaz* and *Bullcoming*, the high court said, "In those cases, the forensic reports were introduced into evidence, and there is no question that this was done for the purpose of proving the truth of what they asserted: in *Bullcoming* that the defendant's blood alcohol level exceeded the legal limit and in *Melendez-Diaz* that the substance in question contained cocaine." (*Williams, supra,* 567 U.S. at p. ___ [132 S.Ct. at p. 2240].) "In *Bullcoming,* we held that [a] . . . scientific report could not be used as substantive evidence against the defendant unless the analyst who prepared and certified the report was subject to confrontation. . . . Instead of calling the analyst who signed and certified the forensic report, the prosecution called another analyst who had not performed or observed the actual analysis, but was only familiar with the general testing procedures of the laboratory. . . . [¶] Just as in *Melendez-Diaz,* the forensic report that was 'introduce[d]' in *Bullcoming* 'contain[ed] a testimonial certification, made in order to prove a fact at a criminal trial.' [Citation.] The report was signed by the nontestifying analyst who had authored it . . . . Critically, the report was introduced at trial for the substantive purpose of proving the truth of the matter asserted by its out-of-court author—namely, that the defendant had a blood alcohol level of 0.21. . . . [¶] . . . '[T]his [*was*] *not a case in which an expert witness was asked for his independent opinion about underlying testimonial reports that were not themselves admitted into evidence.*' [Citation.]" (*Id.* at p. ___ [132 S.Ct. at p. 2233], italics added.)

After *Williams* was decided, the California Supreme Court decided *Lopez.* In *Lopez,* a criminologist testified that he reviewed a lab report authored by a nontestifying colleague who had analyzed the defendant's blood sample. (*Lopez, supra,* 55 Cal.4th. at p. 574.) The criminologist testified that in the report, his colleague had concluded that the defendant had a blood-alcohol level of 0.09 percent. (*Ibid.*) However, the criminologist also testified that

represents the contemporaneous recordation of observable events." (*Id.* at p. 607.) In contrast, the majority in *Melendez-Diaz v. Massachusetts,* in response to comments in its dissent, said that Davis did not suggest that the near contemporaneous nature of statements is to be given substantial weight in determining whether they were testimonial or not. (*Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305 [174 L.Ed.2d 314, 129 S.Ct. 2527] (*Melendez-Diaz*).) *Williams* neither specifically addresses this conflict, nor does it appear to take any position on the significance of discussing the contemporaneousness of the observations as a factor in determining whether a DNA analysis report is testimonial. *Williams* appears either to assume that the DNA analysis report at issue there was testimonial (see fn. 5, *ante,* p. 1121), or that it was irrelevant whether it was or not, because the protections afforded by the confrontation clause do not apply to such reports in the circumstances present in that case. *Bullcoming* also does not mention the contemporaneousness of the statements as a significant factor in determining whether they are testimonial, although, unlike *Williams,* it could logically have done so. (*Bullcoming v. New Mexico* (2011) 564 U.S. ___, ___-___ [180 L.Ed.2d 610, 131 S.Ct. 2705, 2716–2719] (*Bullcoming*).) Although mentioning *Geier, Lopez, supra,* 55 Cal.4th at p. 577, did not comment on the continued vitality of this concept. *People v. Dungo* (2012) 55 Cal.4th 608 [147 Cal.Rptr.3d 527, 286 P.3d 442] (*Dungo*), does not even mention *Geier.*

"based on his own 'separate abilities as a[n] . . . analyst,' " he concluded that the defendant's blood-alcohol level was 0.09 percent. (*Ibid.*) He further testified that he had trained his colleague, was familiar with the methods the latter used to perform analysis and all the analysts in the office used the same methods. (*Ibid.*) The colleague's report was introduced into evidence. (*Ibid.*) The Supreme Court held that admission of the report and those portions of the criminologist's testimony concerning it did not violate the defendant's confrontation rights. (*Id.* at p. 585.)

The court noted that two pages of the colleague's report showed computer-generated numerical results of two analyses of the defendant's blood sample (showing blood-alcohol level of 0.0906 and 0.0908 percent), which bore the colleague's initials, but "no statement by [him], express or implied, appears on . . . those pages." (*Lopez, supra,* 55 Cal.4th at p. 583.) The California Supreme Court continued, "Not yet considered by the United States Supreme Court is whether the prosecution's use at trial of a machine printout violates a defendant's right to confront and cross-examine the machine's operator when, as here, the printout contains no statement from the operator attesting to the validity of the data shown. We agree with those federal appellate courts that have upheld the use of such printouts. [Citations.]" (*Ibid.*) The Supreme Court also cited Justice Sotomayor's[11] concurring opinion in *Bullcoming* that the prosecution's introduction only of machine-generated results, such as a printout from a gas chromatograph, may not violate the confrontation clause. (*Ibid.*) "Because, unlike a person, a machine cannot be cross-examined, here the prosecution's introduction into evidence of the machine-generated print-outs . . . of [the colleague's] . . . report did not implicate the . . . right to confrontation." (*Ibid.*)

Another page of the report contained the number assigned to the defendant's blood sample, which had been written down by an assistant and initialed by the colleague, and the result the colleague derived from his analysis, which had been written by him. (*Lopez, supra,* 55 Cal.4th at pp. 583–584.) The Supreme Court noted, "Based on [the assignment of a particular number to the defendant's blood sample] and the machine-generated results for [that sample, the criminalist] gave his independent opinion—reflecting his 'separate abilities as a[n] . . . analyst'—that defendant's blood sample contained 0.09 percent alcohol. [The assistant's] notation linking defendant's name to [the] blood sample . . . was admitted for its truth. [Citation.] Thus, the critical question here is whether that notation is testimonial hearsay and hence could not be used by the prosecution at trial. [¶] The notation in question does not meet the high court's requirement that to be testimonial the out-of-court statement must have been made with formality or solemnity. . . . [N]either [the assistant] nor [the colleague] signed, certified or swore to the truth of the

---

[11] Justice Sotomayor dissented in *Williams.*

contents of [that] page . . . of the report. . . . Thus, the notation . . . linking defendant's name to [his purported] blood sample . . . is nothing more than an informal record of data for internal purposes . . . . Such a notation, in our view, is not prepared with the formality required by the high court for testimonial statements. [¶] Defendant argues that [the colleague's] . . . laboratory report is indistinguishable from the laboratory certificates that the high court determined to be testimonial in *Melendez-Diaz* and *Bullcoming*. Not so. In *Melendez-Diaz*, 'the certificates were sworn to before a notary . . .' by the testing analysts who had prepared the certificates. [Citation.] And in *Bullcoming*, the laboratory analyst's certificate regarding the result of his analysis was ' "formalized" in a signed document' that expressly referred to court rules providing for the admissibility of such certificates in court. [Citation.] Such formality is lacking here. [¶] Defendant contends that [the colleague's] laboratory report is testimonial under the reasoning of the dissenting opinion in *Williams, supra*, 567 U.S. ___ [132 S.Ct. 2221] (dis. opn. of Kagan, J.). This may well be true, but dissenting opinions are not binding precedent. [Citations.]" (*Lopez, supra*, 55 Cal.4th at pp. 584–585, italics omitted.)"[12]

▮ Both *Williams* and *Lopez* persuade us that the trial court's overruling of defendant's objection was not error. There are two aspects of the technical reviewer's testimony that defendant's objection could be viewed as encompassing, i.e., her reference to the raw data and her reference to the conclusion reached by the clothing/door analyst, which was the same as the conclusion she reached. As to the first, *Lopez* specifically held that a machine printout is not subject to confrontation analysis. Here, it was never established how the raw data was generated, or by whom. Defendant cites no authority that testimony concerning raw data, by an expert subject to cross-examination, violates the confrontation clause.

As to the second aspect, the technical reviewer's reference during her testimony to the conclusion reached by the clothing/door analyst, we note,

---

[12] Arguably, of less applicability to the facts here were those in the companion case of *Dungo*, where a testifying pathologist gave his independent opinion of the cause of death based on the report of his employee-pathologist and photos that the latter had taken during the autopsy. The autopsy report was not introduced into evidence and the testifying pathologist never offered the opinion of the employee-pathologist as to the cause of death. (*Dungo, supra*, 55 Cal.4th at p. 619.) However, the testifying pathologist did reiterate the descriptions of the victim's body contained in the report. (*Ibid.*) The Supreme Court concluded that the primary purpose of the report and accompanying photos was not a criminal investigation and the statements in it were "merely record[ation of] objective facts" which lacked the formality necessary for testimonial statements. (*Id.* at pp. 619, 621.)

The companion case of *People v. Rutterschmidt* (2012) 55 Cal.4th 650 [147 Cal.Rptr.3d 518, 286 P.3d 435] did not address the confrontation clause issue and is, therefore, of no benefit to our analysis. The final companion case, *People v. Gutierrez*, ▮Cal.App., has not yet been decided.

first, that the people analyst testified, without objection from defendant, that no report issued forth from the lab unless it had been checked by a reviewer and its conclusions concurred in by that reviewer. Thus, when the reviewer testified as to her conclusions, the jury necessarily knew that the clothing/door analyst had reached the same conclusions. Moreover, as a general matter, as both *Williams* and *Lopez* concluded, such lab reports, containing these conclusions, lack the degree of formality and solemnity to be considered testimonial for purposes of the confrontation clause. Finally, neither *Bullcoming* nor *Melendez-Diaz* required the trial court here to sustain defendant's objection.

We agree with the People that the technical reviewer's brief reference to the clothing/door analyst's reports and her reliance on the raw data[13] was proper under California authority as well because such items are reasonably relied on by experts in the field of DNA analysis in forming their opinions. (See *People v. Gardeley* (1996) 14 Cal.4th 605, 618 [59 Cal.Rptr.2d 356, 927 P.2d 713].)

We also agree with the People that even if this evidence had been admitted in error, it was harmless beyond a reasonable doubt. Aside from the almost overwhelming nature of the evidence against defendant, and the obvious weakness of his convoluted account of the crimes, the people analyst testified that the murder victim's DNA was on defendant's left ring finger and he was a minor contributor to the DNA on defendant's middle left finger and left thumb. Additionally, she testified that the murder victim was a major contributor to the DNA found on the grip of the gun and defendant was a minor contributor. The evidence at issue—that the murder victim's DNA was found in suspected and actual bloodstains on defendant's clothing and on the door—was consistent with this and was not inconsistent with defendant's claim that the gun accidentally went off, hitting the murder victim in the hand after defendant hit him and took the gun from him.

We decline defendant's invitation to engage in unfounded speculation by assuming that the prosecution had something to hide when he did not call the clothing/door analyst as a witness.

2., 3.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

[13] See footnote 4, *ante*, page 1120.

*See footnote, *ante*, page 1116.

## Disposition

The trial court is directed to amend the indeterminate abstract of judgment to show that the terms for enhancements for both crimes for discharge of a handgun causing death (§ 12022.53, subd. (d)) are 25 years to *life,* not 25 years as the abstract currently states. The trial court is further directed to amend the determinate abstract to show that defendant was convicted of attempted murder, not attempted *first degree* murder,[20] as the abstract currently states. In all other respects, the judgment is affirmed.

Hollenhorst, J., and Miller, J., concurred.

A petition for a rehearing was denied March 15, 2013, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied May 22, 2013, S209540.

---

[20] The jury found not true the allegation that the attempted murder was willful, deliberate and premeditated.