Filed 7/20/15  In re M.D. CA1/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re M.D., a Person Coming Under the Juvenile Court Law. | |
| MARIN COUNTY HEALTH AND HUMAN SERVICES,  Plaintiff and Respondent,  v.  A.S.,  Defendant and Appellant. | A140948  (Marin County Super. Ct. No. JV25835) |

Every professional involved in this sad dependency case concluded mother repeatedly coached her son M.D. to make false sexual abuse allegations against M.D.'s father, her former husband.  The juvenile court found mother was inflicting serious harm on M.D., took jurisdiction, and disposed of the case by awarding father sole legal and physical custody and granting limited supervised visits to mother.  Mother appeals.  We affirm all the challenged juvenile court orders.

## BACKGROUND

M.D. was born in 2002 to his then-married parents.  In 2004, there was a domestic dispute.  Father said mother had made a habit of locking herself in a room with M.D.  On one occasion, mother would not come out or respond to father.  Afraid for M.D.'s safety

and angry, father forced the door open. Mother said she hid in the room with M.D. because father had threatened her life. Father was arrested for making criminal threats. Following this, M.D.'s parents separated and then divorced. Mother retained primary physical custody of M.D. Thereafter, both mother and father made numerous reports to Child Protective Services, all of which were determined to be unfounded. Through this same decade, the parents' family court battle over dissolution issues, including custody, support, and visitation, raged on.

### *Accusations of November and December 2012*

In late November 2012, mother reported M.D., then age nine, had been sexually abused by father. Mother and a family friend, who provided acupuncture services to mother and M.D., said they both heard M.D. talk about father putting father's "pee pee" in M.D.'s "butt." In a November 26 forensic interview at the Keller Center, M.D. reported recounted instances of sodomy in the past three years in which father inserted his penis "all the way inside" M.D.'s anus (M.D. demonstrated by making a ring with his index finger and thumb and placing his opposing index finger through the ring). The incidents supposedly happened while N.M., father's new wife, was at home. They also supposedly happened every time M.D. was visiting his father. According to mother, the acupuncturist told her about the abuse first, not M.D. During the forensic interview, M.D. initially said he told mother first, then said he told both at the same time.

The police orchestrated a phone call from mother to father, in which mother asked father if the molestation occurred and mother pretended to have evidence of bodily fluids near M.D.'s anus. Father vehemently denied the molestation, called mother "nuts" and "disgusting," and called the San Francisco Police Department to express concerns about his son's safety. Meanwhile, a medical exam indicated M.D.'s "Anal Genital Findings" were "normal" and found no evidence of molestation. The social worker who observed the Keller Center interview, and who had the medical information in hand, completed a

report noting a lack of sufficient detail in M.D.'s story and stating her team's belief the allegations of abuse were unfounded.

After learning the results of this investigation, and about the time mother and father had a confrontation over whether father could have his regular Tuesday visit with M.D., mother brought M.D. to a doctor to report an additional, December 18, 2012, incident of sodomy. M.D. told the doctor it hurt a little but he did not care, and that it later felt like father had "peed in [his] butt."

In the midst of these ongoing allegations, in late December, father, who had not had M.D. for Christmas in years, asked for police assistance in enforcing his court-given entitlement to Christmas visitation when mother refused to cooperate. Mother would not answer father's phone calls. When father finally got mother on the phone to assert his right to visitation, mother complained M.D. was sick and re-asserted the molestation allegations. Father said "you know you're crazy" and mother eventually relented and allowed the visit.

The San Mateo District Attorney, in January 2013, issued a letter stating it would not prosecute father for abusing M.D.

### Accusations of March 2013

Mother and M.D. again reported sodomy in March of 2013. M.D. told the police that father " 'put his pee pee in my butt and it got wet.' " When M.D. returned to the police lobby area after private questioning, the officer heard M.D. ask mother several times " 'did [he] do good?' " and noticed mother trying to quiet M.D. Mother insisted on an immediate medical exam, which showed no signs of sodomy. None of the examiners observed physical injuries and M.D. could not even tolerate the insertion of a q-tip into his anus. A follow-up exam was scheduled at the Keller Center. There, again, no signs of sodomy were found. The Keller Center believed mother had been "coaching" M.D. on what to say.

After mother learned of these results and apparently shared them with M.D., she called the Keller Center and said M.D. had confessed to lying—that is, father had "never placed his 'pee pee' inside his 'butt' "—and mother stated she was distraught that she had mistakenly believed her son had been abused when he had not.  It appears this explanation satisfied police and the case against father was again closed.  Meanwhile, the Keller Center urged mother to get therapy for M.D.

### Accusations of July and August 2013

Mother and M.D. made a third round of abuse allegations in late July 2013, just days before father and M.D.'s paternal relatives were to enjoy a nine-day trip to San Diego.  These allegations were far more expansive.  At another Keller Center forensic interview, M.D. described a "pee pee game" in which he, father, and his four-year-old half sister (father's child with his new wife), ran around the house trying to touch each other's private parts.  M.D. also said father put his "pee-pee on his butt with no clothes" and M.D.'s butt gets wet and sticky.  M.D. also stated father sometimes holds and bites M.D.'s penis and that M.D. sometimes does the same to father's penis.  M.D. also stated father would command him and the new wife to "have sex," which meant to roll around on the floor and kiss.  M.D. finally stated father made up a game where he and father lay naked in the bed and kiss and then father gratifies himself by rubbing on M.D.  M.D. said the new wife and his step-sister also joined in the game.  M.D. said he lied in regards to the earlier sodomy allegations because he wanted the games with father to continue.

During this interview, M.D. repeatedly asked for a break when he was asked for details about the incidents that he could not provide.  M.D. could not provide sufficient "details of any sex act," which was unusual for an articulate child of his age.  M.D.'s tone and demeanor were nonchalant, devoid of emotion—like he was reading a laundry list— despite recounting a full panoply of horribles.  Mother was told by several practitioners who saw M.D.'s interview that M.D.'s story was hard to believe.  One of the Keller Center forensic interviewers stated it was the first time she had disbelieved a child; she

could not say for sure if M.D. had been coached, but she was confident there was no abuse.  Mother was also told her failure to seek therapy for M.D. after the recanted abuse allegations in March of 2013—mother claimed she was waiting for therapists to call her back—was abuse in itself.  That M.D. was making such horrific statements was a "significant disturbance" requiring intervention.  Mother wanted a second interview, but the Keller Center denied it, stating it was "not indicated and would be detrimental to [M.D.]"

Mother, upset, left the Keller Center without informing anyone and had M.D. examined again at Community Violence Solutions in San Rafael, where M.D. largely repeated his story, adding such things as father threatening the new wife, N.M., to make her participate.  Mother also worked with M.D. to prepare an audio recording describing the alleged abuse, which she presented to the police.  According to mother it was meant to keep M.D. safe and to prevent the vacation, which M.D. then told police he wanted to go on.  Mother also presented a journal that M.D. supposedly wrote which further documented the abuse allegations.  Police were concerned the journal was a fraud based on language choices and some handwriting discrepancies.

Father, the new wife, and the half sister were interviewed, and the allegations of abuse as to the half sister were considered unfounded.

When a social worker visited M.D. and mother on August 9, 2013, M.D. repeated his latest abuse allegations.  When finished, M.D. asked mother if he could " 'have his toys now.' "  The toys were in a garbage bag.  Mother said nothing, but M.D. went to get them.  When asked why the toys were in the bag, M.D. replied "just because" and smiled and winked at his mother.

In the midst of this latest investigation, mother refused to drop M.D. off with father for scheduled visitation and the San Diego vacation, which was to have begun on August 1, 2013.  Mother was apparently in violation of a court order but claimed to be exercising her "Motherly rights."

*Petition Against Mother*

Marin County Department of Health and Human Services filed a juvenile dependency petition on behalf of M.D. on August 21, 2013. According to the County, mother persistently, willfully, and falsely accused father of sexual abuse toward M.D. such that M.D. had to endure unnecessary, invasive physical and mental testing—including two SART exams which involved genital photography and anal and genital swabbing. The County also alleged mother was refusing to treat M.D.'s documented mental health issues, was responsible for M.D.'s truancy and his working at a first grade rather than a fifth grade level at school, and was improperly blocking M.D. from having contact with his father. The County concluded mother's conduct put M.D. at risk of serious physical harm (Welf. & Inst. Code, § 300, subd. (b))[1] and serious emotional damage (§ 300, subd. (c)).

M.D. was ordered detained at the home of a paternal aunt. Mother was initially granted one, two-hour supervised visit per week at the department and father was granted one, two-hour unsupervised visit per week at the aunt's house with the aunt present.

*Jurisdiction and Disposition*

The County submitted jurisdiction and disposition reports, and the court held a lengthy hearing on both issues between November 2013 to January 2014 at which it heard from numerous live witnesses. Aside from demonstrating the facts as set forth above, the evidence showed what had transpired since M.D.'s detention.

First, M.D. had stopped asserting there had been abuse. He told a social worker on October 14, 2013, that mother made him make false accusations after incessantly berating him with details of the supposed abuse to the extent M.D. was willing to believe the abuse occurred. M.D. repeated his recantations and feelings of embarrassment to

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

other social workers. He told a social worker he understood mother was trying to keep him from visiting with his paternal relatives.

Evidence also showed M.D. thriving with increased exposure to his father. A social worker testified visits with father "[a]bsolutely" increased because M.D. was "not afraid of his father at all." The social worker was having frequent, weekly interactions with M.D.'s attorney to get updates and assure M.D.'s comfort. Even though M.D. was not living with his father, he was visiting with him overnight and there were no negative reports. Since M.D. had been taken from his mother and placed with his paternal aunt, M.D. was making significant progress at school. He had not been absent or late as he had been before and he was more focused and engaged. A resource teacher who had worked with M.D. for over a year said she had " 'rarely seen anything like it.' "

The County, after investigating father and talking with the various authorities, found there was "no basis whatsoever" to deny placement of M.D. with father. M.D.'s attorney also expressed no reservations, and advocated for removal from mother and placement with father.

Meanwhile, mother obdurately refused to drop her accusations that father is an abuser and to obtain adequate therapy for M.D. Despite placing a few calls to therapists to inquire about treatment, mother had not followed through. Mother believes she must separate M.D. from father "permanently" and that therapy cannot begin until this is accomplished. The evidence thus indicates mother has resisted treatment for M.D. even as numerous care providers recommended it, even as multiple referrals were given, and even though she was told that if abuse was really happening, M.D. urgently needed therapy. As stated in the disposition report, "[m]ultiple service providers point to [mother] as a primary obstacle to [M.D.] receiving mental health treatment."

Mother also perceives she has done nothing wrong and is "innocent." In fact, she has publicized M.D.'s case on the Internet, even posting portions of M.D.'s graphic

journal, despite M.D.'s embarrassment over the allegations and the likely harm to M.D. that would ensure.

The County recommended placement with father and denial of reunification services to mother, who would receive only supervised visits. M.D. wished to reside only with father, not mother. Moreover, reunification services would likely harm M.D., said the County, because mother has a history of not following court custody orders (back to 2009) and is determined to pursue abuse allegations even if it means dragging M.D. through further emotional and physical trauma. M.D. told a social worker the County was right to be leery of mother saying things to M.D. during visits that would be hurtful. M.D. did not want to talk about the things that mother would say, but he clearly wanted visits with mother to be supervised.

Mother took the stand. She denied coaching M.D., painted father as a violent and aggressive person, and said she could not ignore her child's disclosures of abuse. She claimed she had made reasonable efforts to get therapy for M.D. for his anxiety.

Following the contested jurisdiction and disposition hearing, the juvenile court stated its rulings on the record. It believed father was not an offending parent and found returning M.D. to mother would be detrimental, physically and emotionally. It concluded it had jurisdiction under section 300, subdivisions (b) and (c). It granted father sole legal and physical custody of M.D. and denied reunification services to mother. Mother was granted supervised visits, which could "be held at—or other supervised visitation facility, or at the discretion of the" County. The juvenile court dismissed the dependency proceeding.

Mother timely appealed.

**DISCUSSION**

*Interview of Minor in Chambers Without Parents' Counsel*

Before the combined jurisdiction and disposition hearing, M.D. moved to quash a subpoena by mother to have M.D. testify at the hearing. M.D. asked the court to rely on

the written evaluations and records. Mother opposed the motion, citing the minor's inconsistent statements about the alleged abuse. The juvenile court granted the motion and said it would not require testimony from M.D. given the ample written record already made in the case and the child dependency hearsay exception.

But on December 26, 2013, the court decided to question M.D. in chambers after all. The origin of this desire is unclear, the court said "it seems important to me that I know who [M.D.] is . . . . I'm just simply going to talk with [M.D.]" There would be a written transcript of the hearing for all counsel to review. The court agreed M.D.'s counsel could be present. Mother's counsel then requested to attend as well, but the court denied the request out of a fear of intimidating M.D. with numbers, and mother's counsel stated she understood. Mother's counsel next requested the opportunity to ask follow-up questions after reviewing the written transcript. The court said that could be addressed if needed after the interview but that, at present, no follow up was contemplated. Mother never sought to ask any follow-up questions.

In chambers, M.D., corroborating what he had said to the social workers, said mother keeps telling him things about father that are not true, and he views this as "bad."[2]

Mother again objected to not being allowed into the in camera interview and to not being allowed questioning, but not until her closing argument on January 3, 2014. There appears to have been no mention of these issues in the interim.

Mother, on appeal, contends she was deprived of her right to due process and a fair trial when the court heard from M.D. in chambers without allowing mother to cross-examine or propose follow-up questions, and without allowing mother to have counsel present.

---

[2] Contrary to mother's assertion on page 29 of her opening brief, there already was evidence from the disposition report that M.D. had blamed his mother for putting the abuse allegations in his head. Mother does not challenge the admissibility of this evidence on appeal.

Though mother neglected to raise any authorities in the trial court in support of her demand to be present for M.D.'s interview, California Rule of Court, rule 5.534(c), implementing section 350, subdivision (b), does provide: "In a hearing under section 300 et seq., a child may testify in chambers and outside the presence of the child's parent or guardian *if the parent or guardian is represented by counsel who is present*, subject to the right of the parent or guardian to have the court reporter read back the child's testimony, and if the court determines, based on the petitioner's report or other offers of proof or other evidence, that any of the following circumstances exist: [¶] (1) Testimony in chambers is necessary to ensure truthful testimony; [¶] (2) The child is likely to be intimidated by a formal courtroom setting; or [¶] (3) The child is afraid to testify in front of the parent or guardian." (Cal. Rules of Court, rule 5.534(c), italics added; see also § 350, subd. (b).)

A juvenile court "cannot adopt an innovative rule without taking into account its effect on the constitutional rights of the parties, and . . . a court should be particularly reluctant to use a novel procedure which is of dubious constitutional validity." (*In re Amber S.* (1993) 15 Cal.App.4th 1260, 1266.) Even in dependency proceedings, there must be consideration given to a parent's right, at least through counsel, to have meaningful representation or cross-examination if the dependent minor is made to testify. (*Id.* at p. 1265; cf. *In re Cole C.* (2009) 174 Cal.App.4th 900, 913 ["The parent in a dependency proceeding has a due process right to confront and cross-examine witnesses," though not specifically addressing minors.]; *In re E.S.* (2011) 196 Cal.App.4th 1329, 1340.) One court stated: "There is no provision in" the code or rule of court "which permits a minor's in camera testimony in the absence of the parent's attorney," and a juvenile court may not exclude a parent's attorney from the in camera hearing. (*In re Laura H.* (1992) 8 Cal.App.4th 1689, 1693–1694 (*Laura H.*).)

Initially, we cannot accept the County's unsupported assertion that M.D. was not technically "testifying" in chambers and thus mother had no right to counsel or to

confrontation. The judge may have intended an informal conversation with M.D., but she asked questions that led M.D. to make statements about the key issues in the dependency case, the conversation was transcribed by a court reporter, and M.D. was told this was for the stated purpose of making a clear record (even if the record does not disclose M.D. being sworn). This interview was not a quick "check up" to see if the minor would be comfortable with a pre-chosen placement, for example. (See, e.g., *In re Heather H.* (1988) 200 Cal.App.3d 91, 96 ["Respondent suggested, at oral argument of this matter, that examination of the child in chambers was not for the purpose of taking his testimony but merely to observe him and to determine his state of mind. Nothing in the record, however, indicates that the purpose of the proceeding in chambers was so limited. We are simply unable to determine that the statutory requirement [for oath taking of all witnesses] was not applicable in this case."].)

Nor can we accept County's argument mother waived her objection to have her counsel present at the in camera proceeding. Though a parent's right to counsel can be waived (see *Laura H.*, *supra*, 8 Cal.App.4th at p. 1694; *In re Meranda P.* (1997) 56 Cal.App.4th 1143, 1157, fn. 9), mother clearly requested to be present and she later objected, on that basis, to the consideration of M.D.'s statements during closing argument.

However, we readily conclude there was no prejudicial error to mother from excluding her counsel from the in camera proceeding. First, viewing mother's claim as one for deprivation of the right to counsel, it is now understood that, "[w]ith respect to a parent's assertion of a violation of the statutory right to representation or the statutory right to adequate representation, the parent must . . . show 'it is "reasonably probable . . . a result more favorable to the appealing party would have been reached in the absence of the error." ' [Citations.] With respect to a parent's assertion of a violation of the constitutional right to counsel, the parent must also show there was a 'determinative difference' in the outcome of the proceeding by reason of the parent's lack of counsel,

such that the proceeding was rendered fundamentally unfair to the parent." (*In re Meranda P., supra,* 56 Cal.App.4th at p. 1153, fn. omitted; *In re Jamie R.* (2001) 90 Cal.App.4th 766, 772.)

Mother promptly received the transcript of M.D.'s in camera statements and was explicitly given the opportunity to request follow up. Mother's counsel's choice to not request follow up questions does not mean mother's counsel was prejudicially absent from the in camera proceeding; rather, it suggests counsel's presence was not truly required. Thus, we cannot say mother was deprived of meaningful representation, nor was mother denied a more favorable result or different outcome because of the juvenile court's procedure. This procedure was little different than the one-way closed circuit television embraced in *Amber S.*, *supra*, 15 Cal.App.4th at page 1263, a procedure which mother states in her opening brief would have been satisfactory, in which "the only other persons present" in chambers with the minors and the judge "were the attorney questioning her, the social worker, and the court reporter[;] . . . [t]he trial court, the parties, and the other attorneys contemporaneously viewed the testimony from the courtroom," but could not directly participate.[3] Accordingly, any deprivation of counsel was harmless error.

Next, we turn to mother's due process right to confront and cross-examine. Mother may not have waived a right to counsel, but, as just discussed, she did waive any right to confront and cross-examine. Mother never asked the juvenile court for follow up questioning despite being invited to do so. Her claim in closing argument on January 3, 2014, that she was not "provided an opportunity to question the minor" is proven false by the record. Mother was explicitly given an opportunity to request follow up questioning, but mother made no effort in that regard. Mother cannot, for the first time on appeal,

---

[3] We note there was no due process challenge or other constitutional challenge in the case. (*Amber S.*, *supra*, 15 Cal.App.4th at p. 1264.)

demand an opportunity to ask questions of the minor when she so clearly could have sought that exact opportunity from the juvenile court. (*People v. Steppe* (2013) 213 Cal.App.4th 1116, 1119, fn. 2 ["defendant failed to cross-examine the analyst below about these potential inaccuracies, thereby waiving the matter"].) This is precisely the kind of delay juvenile dependency proceedings should be without.

### *Motion for Expert to Further Evaluate M.D.*

On September 12, 2013, ahead of the contested hearing, mother moved the juvenile court to appoint an independent expert who would opine on whether M.D. was fabricating the abuse allegations at his mother's behest and whether M.D. was being harmed by mother's conduct. The court denied the motion, stating M.D. had been subjected to numerous forensic interrogations and expert evaluations which addressed the veracity of M.D.'s allegations and the harms being inflicted on M.D., and which were in no way shown to be anything but "independent."

The juvenile court did not abuse its discretion in denying mother an expert to make further first-hand evaluations of M.D. "Although the court in a proceeding such as this is assuredly empowered to appoint one or more factfinding expert witnesses (Evid. Code, § 730), such action is a matter of discretion. Refusal to appoint a second expert to examine any particular issue will ordinarily not constitute abuse of discretion." (*In re Jennifer J.* (1992) 8 Cal.App.4th 1080, 1084.) Further, consideration of harm to the minor from further evaluations is legitimately considered. (*In re Daniel C. H.* (1990) 220 Cal.App.3d 814, 835 ["[F]urther evaluation . . . by yet another expert would be detrimental . . . and . . . unnecessary because of the availability of sufficient expert opinions."].) Here, the juvenile court considered the trove of expert evaluations already made and available to it, as well as the harm of further probing to M.D. and reasonably denied mother's motion.

To the extent mother now argues on appeal that an expert should have been appointed to make an independent psychological assessment of mother and father, that

contention was never raised in mother's motion to the juvenile court and thus we deem it forfeited.  (See *In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1339 [failure to request bonding study waives issue on appeal]; *Ventura v. ABM Industries, Inc.* (2012) 212 Cal.App.4th 258, 265 [failure to seek ruling from trial court forfeited issue on appeal].)

***Substantial Evidence Supported Jurisdiction***

" 'In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted or uncontradicted, supports them.  "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court."  [Citation.] "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court. [Citations.]  ' "[T]he [appellate] court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence . . . such that a reasonable trier of fact could find [that the order is appropriate]." ' [Citation.]" [Citation.]' [Citation.]" (*In re I.J.* (2013) 56 Cal.4th 766, 773.)

"Substantial evidence, however, is not synonymous with any evidence.  [Citation.] 'A decision supported by a mere scintilla of evidence need not be affirmed on appeal.' [Citation.]  Although substantial evidence may consist of inferences, those inferences must be products of logic and reason and must be based on the evidence.  Inferences that are the result of mere speculation or conjecture cannot support a finding.  The ultimate test is whether a reasonable trier of fact would make the challenged ruling considering the whole record." (*In re James R.* (2009) 176 Cal.App.4th 129, 135.)

" 'When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the

juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence.' [Citation.]" (*In re I.J.*, *supra*, 56 Cal.4th at p. 773.)[4]

The dependency petition here primarily concerns emotional abuse, so we focus on the claim M.D. falls under section 300, subdivision (c), which allows jurisdiction over a child if "[t]he child is suffering serious emotional damage, or is at substantial risk of suffering serious emotional damage, evidenced by severe anxiety, depression, withdrawal, or untoward aggressive behavior toward self or others, as a result of the conduct of the parent . . . ." (§ 300, subd. (c).)

There is more than ample evidence supporting the trial court's jurisdictional findings that mother subjected M.D. to trauma by brainwashing him with false abuse allegations, by having him repeat those allegations, and by having him examined on numerous occasions by social workers, forensic interviewers, and medical doctors—all in an apparent campaign to deprive father of a relationship with his son. M.D. confided this to the social workers during their postpetition investigations in October 2013. (He then repeated this to the juvenile court judge when he was in chambers on December 26, 2013.) The juvenile court clearly credited the social worker reporting M.D.'s remarks, M.D., father, and the majority of professionals who interacted with M.D., over mother. It had the opportunity to see mother offer live testimony. Its choices in crediting and not crediting the evidence before it were not error.

---

[4] Mother cites a number of Court of Appeal decisions suggesting we have the discretion to address all grounds of the petition in order to prevent future prejudice to mother from any unsubstantiated grounds. (See *In re D.P.* (2014) 225 Cal.App.4th 898, 902.) *In re I.J.*, decided by our Supreme Court, holds we need not do so. Mother does not address the case. (*In re I.J., supra*, 56 Cal.4th at p. 773.) We decline to reach other grounds of the County's petition.

According to mother, the County did not meet its burden to put on substantial evidence mother was *causing* the emotional damage or risk thereof. (See *In re Nicholas B.* (2001) 88 Cal.App.4th 1126, 1136 & fn. 11 [parental causation must be shown].) Yet there is ample evidence that mother's conduct resulted in serious emotional harm or put M.D. at serious risk of such harm. After the July 31, 2013, Keller Center interview, mother was told by the interviewing nurse practitioner that M.D.'s false statements of abuse were a "significant disturbance" that had to be addressed by therapy, and that failure to seek help after the March allegations and recantation was itself abuse. When mother pushed for a further forensic examination of M.D., the interviewer had to deny it to protect M.D. from further harm. The interviewer's assessment alone provides evidence of harm or likely harm. (See *In re Shelley J.* (1998) 68 Cal.App.4th 322, 330.) Even without it, common sense dictates that berating M.D. with horrific false accusations of molestation "was hideously inappropriate." (*In re H.E.* (2008) 169 Cal.App.4th 710, 724 ["It did not take a mental health professional or other expert to" support conclusion that "mother's open, incessant charges of sexual abuse against father in front of his asserted victims, both less than three years old, was hideously inappropriate [and] emotionally damaging to the children. . . ." "It took no insight beyond common sense to conclude that H.E. was old enough to understand these charges on some level and to have suffered ill effects . . . ."].) Even if M.D. could be said to have escaped serious harm so far, the evidence indicated mother was not going to give up her pursuit of false allegations, putting M.D. at risk of serious future harm. (*In re A.J.* (2011) 197 Cal.App.4th 1095, 1105.)

Furthermore, the evidence supports the conclusion that while father made ongoing efforts to get M.D. into therapy, mother, despite numerous calls to action from a host of therapists and other health professionals, made only token efforts that did not result in any real, ongoing treatment regarding M.D.'s disturbing disclosures. She never followed up with many possible caregivers, blaming many for never returning her calls. Mother

refused treatment with several therapists father had arranged, or that had been recommended by other providers, including Dr. Kyskan (father sought her assistance in January 2013) and Dr. Beauford (father sought his assistance at the recommendation of Dr. Weiss in April 2013). Thus mother not only inflicted harm but refused, for months on end, to help her son get treatment for that harm.

Finally, the minor's significant improvement at school coincided with his leaving mother's custody and having unsupervised overnight visits with father, and supports the inference that it was her conduct that was stifling him. There is evidence mother had compounded the harm in this case by repeatedly moving M.D. from school to school for questionable reasons and in causing serious tardiness and truancy issues at those schools.

Since M.D. had been taken from his mother and placed with his paternal aunt, M.D. was making significant progress at school. He had not been absent or late to school as he had been before and he was more focused and engaged. A resource teacher who had worked with M.D. for over a year said she had "rarely seen anything like it."

Accordingly, the juvenile court did not err in taking jurisdiction over M.D.

**_Placement with Father at Disposition_**

Mother next argues placement with father was an abuse of discretion, citing the accusations she has leveled and those M.D. made to the various interviewers and the family friend—accusations that father physically, sexually, and verbally abused M.D. Mother also points to evidence of past marijuana use by the father. Yet the County investigated and cleared father for placement, M.D. repeatedly expressed wishes to be placed with father, the social workers and health professionals had no qualms about placement with father, school personnel praised father's involvement in his son's life, and M.D. began to thrive as unsupervised time with father increased.

" ' "A parent's right to care, custody and management of a child is a fundamental liberty interest protected by the federal Constitution that will not be disturbed except in extreme cases where a parent acts in a manner incompatible with parenthood."

[Citation.]' (*In re Abram L.* (2013) 219 Cal.App.4th 452, 461 . . . (*Abram L.*).) A nonoffending parent has a constitutionally protected interest in assuming physical custody of his or her dependent child which may not be disturbed ' "in the absence of clear and convincing evidence that the parent's choices will be 'detrimental to the safety, protection, or physical or emotional well-being of the child.' " ' (*Ibid.*)

"The rights of a noncustodial and nonoffending parent to custody of a dependent child are governed by section 361.2(a), which provides: [¶] 'When a court orders removal of a child pursuant to Section 361, the court shall first determine whether there is a parent of the child, with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of Section 300, who desires to assume custody of the child. *If that parent requests custody, the court shall place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child. . . .*' (Italics added.) The statute 'evinces the legislative preference for placement with the noncustodial parent when safe for the child. [Citation.]' [Citation.] It requires placement with a noncustodial, nonoffending parent who requests custody 'unless the placement would be detrimental to the child.' [Citation.]

"To comport with due process, the detriment finding must be made under the clear and convincing evidence standard." (*In re C.M.* (2014) 232 Cal.App.4th 1394, 1400–1401.) "Clear and convincing evidence requires a high probability, such that the evidence is so clear as to leave no substantial doubt." (*In re Luke M.* (2003) 107 Cal.App.4th 1412, 1426.) "The nonoffending parent does not have to prove lack of detriment. Rather, the party opposing placement with a nonoffending parent has the burden to show by clear and convincing evidence that the child will be harmed if the nonoffending parent is given custody. [Citation.]" (*In re C.M.*, *supra*, at p. 1402.)

The record amply supports the juvenile court's finding of no detriment and its placement of M.D. with father. Having reasonably rejected the recanted, coached sexual

abuse allegations, and considering the opinions of the child welfare professionals and the evidence of M.D. improving in father's care, the juvenile court's conclusion that detriment had not been shown by clear and convincing evidence—that is, beyond substantial doubt—was not error. We also note that past incidents of possible aggression or drug use (for example, father's now decade-old arrest for criminal threats), do not establish clear and convincing evidence of current detriment. (See *In re C.M.*, *supra*, 232 Cal.App.4th at pp. 1403–1404 ["Father's 1994 conviction for domestic violence and mother's unsubstantiated claim that father abused alcohol do not change our analysis, especially since neither formed the basis of jurisdiction" and " there was no evidence of any recent, much less current, domestic violence by father, and mother's mental health issues made her a questionable reporter on the issue of father's alcohol use."]; *Abram L., supra*, 219 Cal.App.4th at p. 463 ["Although mother claimed that father had substance abuse problems, she had not lived with father for many years, and there is no evidence in the record that father used illicit drugs or drank an inappropriate amount of alcohol at any time after these proceedings began."].)

### *Denial of Reunification Services to Mother and Custody to Father*

Unlike when a child is placed in foster care, when placed with another parent, there is no presumption that reunification services will be granted to the parent losing his or her child. (*In re Gabriel L.* (2009) 172 Cal.App.4th 644, 651; *In re Erika W.* (1994) 28 Cal.App.4th 470, 475 [there are a "different set of rules regarding the provision of reunification services in those cases where custody of a minor is shifted from one parent to another parent"].) In such cases, the court "may" choose one of several paths. (§ 361.2, subd. (b).) These include granting legal and physical custody outright to the noncustodial parent (§ 361.2, subd. (b)(1)) and granting custody subject to the court's supervision, in which case the court "may order that reunification services be provided to the parent or guardian from whom the child is being removed" (§ 361.2, subd. (b)(3)).

As the statutory language suggests, "[t]he decision whether to provide services and to which parent is discretionary." (*In re Gabriel L., supra*, 172 Cal.App.4th at p. 651.) In fact, " '[t]he juvenile court has broad discretion to determine what would best serve and protect the child's interest and to fashion a dispositional order in accordance with this discretion.' [Citation.] The reviewing court will not reverse the court's order in the absence of a clear abuse of discretion." (*Id.* at p. 652; *In re Nada R.* (2001) 89 Cal.App.4th 1166, 1179.)

Here, the juvenile court chose to grant father outright custody of M.D. and to deny reunification services to mother. Mother contends the court should have chosen supervised custody and provided her with reunification services. Yet the evidence fully supports the trial court's discretionary denial of services to mother. The County believed services to mother would likely harm M.D. because mother has a history of not following court orders (custody order dating back to 2009) and was viewed as determined to make her abuse allegations stick even if it meant dragging M.D. through further emotional and physical trauma. Mother indicated she would not accept father's innocence and would not obtain therapy for M.D. unless he was permanently separated from father. During the pendency of this proceeding, mother confirmed the County's fears by publicizing M.D.'s case and "journal" on the Internet without seeming to grasp the further embarrassment this could cause. Mother, moreover, has steadfastly maintained her own innocence and has denied the existence of any problems of her own. M.D., in turn, expressed his desire at the time of the dispositional hearing to reside only with father, not mother.

Thus, we find no abuse of discretion in denying mother services. (See *In re Jaden E.* (2014) 229 Cal.App.4th 1277, 1289 [not error to deny services and to focus on "parent most likely to retain later custody without juvenile court supervision," when child was thriving in that parent's care and when other parent had made no progress in addressing problems]; *In re Nada R., supra*, 89 Cal.App.4th at p. 1179 & fn. 4 [juvenile court did not err in denying services to parent when he refused to recognize his harmful behavior and

so could not or would not correct it].)  Further, we note that given the availability of father for placement, denying services to mother, when she cannot offer a safe home, furthers the goals of the Welfare and Institution code to provide safety and stability for California's children.  (*In re Erika W., supra*,  28 Cal.App.4th at p. 476.)

Nor do we find error in the juvenile court's simultaneous choice to grant father physical and legal custody outright under section 361.2, subdivision (b)(1).  For reasons already discussed at length, the decision is fully supported by the record.  Mother focuses our attention on a string of family court orders dating from 2004 giving custody of M.D. to mother.  She argues the juvenile court's order is a "stark change."  But the family court orders predate this dependency proceeding and do not address mother's involvement in repeatedly coaching M.D.'s now-recanted abuse allegations.  The "stark change" came about precisely because of the dependency proceeding.

### *Visitation*

Finally, mother challenges the juvenile court's order of limited visitation.

First, we must determine what visitation the juvenile court ordered.  As noted above, in its oral rulings, the court granted mother supervised visits, which could "be held at—or other supervised visitation facility, or at the discretion of the" County.

But along with these oral rulings, the juvenile court entered several written orders referencing visitation.  First, the minute order for the January 27, 2014, hearing stated mother would have supervised visitation, and following dismissal, mother's visitation would be as agreed by the parents or determined by the San Mateo Family Court. Second, included with the jurisdictional and dispositional order forms (JV-415, JV-412) was a visitation attachment (JV-400) which stated the County would supervise visits with mother and the paternal aunt would supervise visits with father while the County retained discretion to modify visitation as to both parents.  As the juvenile court tried to make clear during the hearing, the JV-400 represented a historical snapshot of the world "at that time" prior to the hearing.  Third, the juvenile court entered a "Final Judgment" (JV-

200) which incorporated a visitation attachment (JV-205) which in turn specified "[m]other will continue visit with [M.D.] one (1) time per week, for two hours, supervised."

Mother contends this combination of oral and written rulings is conflicting and indefinite and cannot stand. We disagree. The juvenile court plainly intended, as stated in the JV-205 form, for visits with mother to be supervised and once a week for two hours. That is not inconsistent with the parents being able to agree to altered visitation or the family court having leave to change ordered visitation pursuant to section 302, subdivision (d), which allows for changes in case of "a significant change of circumstances" (if, for instance, mother shows she no longer poses an emotional threat to M.D.). The historical nature of the JV-400 is manifest: the juvenile court was not granting "supervised visitation" to father as it was giving him sole legal and physical custody. Thus, the orders regarding visitation are clear enough.

Finally, although the juvenile court could have ordered more visitation, the evidence regarding the harm mother might inflict on M.D., already discussed at length, supports the limited visitation it did order.

## DISPOSITION

We are compelled to say this is one of the most meritless dependency appeals we have seen and it is a sad reflection of mother's unrelenting campaign against her former husband, without regard to the damage it wrecks on her child, M.D. It only confirms the soundness of the juvenile court's jurisdictional and dispositional orders, which are affirmed.

_____
Banke, J.

We concur:

_____
Margulies, Acting P. J.

_____
Dondero, J.