Filed 3/16/22  P. v. Buenrostro CA4/3
Opinion following transfer from Supreme Court

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>VICTOR BUENROSTRO,<br><br>  Defendant and Appellant. | G058813<br><br>(Super. Ct. No. 18CF0617)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Patrick Donahue, Judge.  Affirmed in part, reversed in part, and remanded with directions.

Steven A. Torres, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra and Rob Bonta, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland and Melissa Mandel, Assistant Attorneys General, Daniel Rogers and Vincent P. LaPietra, Deputy Attorneys General, for Plaintiff and Respondent.

This case comes to us on transfer from the California Supreme Court. After we affirmed the judgment committing appellant to prison for 28 years, the Supreme Court granted his petition for review and ordered us to vacate our decision and reconsider the matter in light of various sentencing laws that became effective on January 1, 2022. Given these new laws, we agree with the parties that appellant is entitled to be resentenced. Therefore, we vacate our prior opinion in *People v. Buenrostro* (Sept. 14, 2021, G058813) [nonpub. opn.], reverse appellant's sentence, and remand the matter for a new sentencing hearing. However, we remain convinced appellant's arguments regarding the sufficiency of the evidence and the introduction of certain evidence lack merit. Therefore, we affirm the judgment in all other respects.

FACTS

Around 10:45 p.m. one evening, Maria L. and Goly T. were standing by Maria's car in the parking lot of a Santa Ana strip mall. A homeless man named Ricardo was sitting nearby, under a tree, and his bicycle was leaning up against a van on the other side of the parking lot. Appellant, then age 21, was over by the bike, seemingly oblivious to Ricardo. But when appellant got on the bike, Ricardo called out "Hey, that's my bike" and started hurrying toward him.

Appellant responded by getting off the bike, pulling out a gun and pointing it at Ricardo. Seeing the gun, Maria and Goly ducked behind Maria's car. From that vantage point, Maria could see Ricardo and appellant fighting. They went at it for about 20 seconds before the gun went off and Ricardo fell to the ground.

Appellant fled the scene, without the bike. Maria and Goly ran into a nearby building, and when they returned to the scene a few minutes later, they saw Ricardo lying on top of the gun. He survived the single gunshot wound to his chest, but he was unavailable for trial.

Because the parking lot was dimly lit Maria and Goly did not get a clear look at appellant. When the police showed them a six-pack lineup containing appellant's

2

photograph, Maria said appellant and one of the other men pictured resembled the person who shot Ricardo. However, Goly was unable to identify anyone from the lineup, and at trial, neither she nor Maria could identify appellant as the shooter.

The prosecution therefore relied on forensic evidence to prove its case. Based on testing conducted at the Orange County Crime Lab (OCCL), the state connected appellant to the shooting by establishing his DNA was found on the gun used to shoot Ricardo.

Appellant did not testify or present any evidence on his own behalf. Although the jury acquitted him of attempted murder, it found him guilty of assault with a firearm, attempted robbery and two other gun-related offenses. The jury also found true various enhancement allegations, and in a separate proceeding, the trial court found appellant had suffered a prior strike conviction for which he served a term in prison. The court sentenced him to 28 years in prison for his crimes.

DISCUSSION

*Sufficiency of the Evidence*

Appellant contends there is insufficient evidence to support the jury's finding he committed attempted robbery because he gained possession of Ricardo's bicycle without using force or fear, and he did not shoot Ricardo until he had already abandoned the bike. However, applying the rules applicable to inchoate offenses, we find there is enough evidence to support appellant's conviction for attempted robbery.

The standard of review for assessing the sufficiency of the evidence to support a criminal conviction is "highly deferential." (*People v. Lochtefeld* (2000) 77 Cal.App.4th 533, 538.) Our task is to "review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence . . . from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.]" (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.) In so doing, we do not reweigh the evidence that was adduced at trial; rather, "[w]e presume in support of the

3

judgment the existence of every fact the trier of fact reasonably could infer from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.]" (*Ibid*.) "The conviction shall stand 'unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [it]."'' [Citation.]" (*People v. Cravens* (2012) 53 Cal.4th 500, 508.)

In California, a robbery occurs when the defendant takes personal property from a person or from his immediate presence by means of force or fear with the intent to permanently deprive the person of that property. (Pen. Code, § 211; *People v. Marshall* (1997) 15 Cal.4th 1, 34.) As so defined, a robbery cannot occur unless the victim is actually deprived of his property. However, a person may be convicted of *attempting* to commit a crime even if the intended crime was not actually committed. (*People v. Chandler* (2014) 60 Cal.4th 508, 517.) All the law requires for an attempt is the intent to commit the crime and a direct act aimed toward its commission. (*People v. Davis* (2009) 46 Cal.4th 539, 606.) The requisite intent "'may be, and usually must be, inferred from circumstantial evidence.' [Citation.]" (*Ibid*.)

In this case, the subject property – Ricardo's bicycle – was leaning against a van in a dimly lit parking lot late at night when appellant approached it. Because Ricardo was not in the immediate vicinity, appellant had ready access to the bike and did not encounter any resistance taking control of it. Thus, from appellant's perspective, the bike appeared to be an easy target for pilferage. While it is certainly *possible* he was just checking out the bike or had some other innocent purpose in mind, his actions suggest otherwise. When Ricardo approached him and told him the bike was his, appellant did not ask for Ricardo's permission to ride the bike or accede to Ricardo's claim of ownership. He did not suggest some innocent explanation for starting to ride the bike. Instead, he pulled his gun, fought Ricardo, and shot him in the chest. This could certainly

4

be understood as an indication appellant was fully prepared to counter any resistance from the bike's owner. Even though appellant did not make off with the bike in the end, the circumstances of the encounter were such that the jury could reasonably conclude he intended to steal it.

So, too, could the jury reasonably find appellant's actions went beyond mere preparation in an effort to put his plan into action, which is the second requirement for an attempted offense. (*People v. Watkins* (2012) 55 Cal.4th 999, 1021; *People v. Lopez* (2020) 46 Cal.App.5th 505, 515.) In fact, by getting onto the bike without Ricardo's permission and using deadly force to resist Ricardo's effort to reclaim it, appellant completed every step of the robbery except the final act of taking the property away. This was sufficient to prove he committed a direct act toward the commission of that offense. (See *People v. Dillon* (1983) 34 Cal.3d 441, 455-456 [having arrived at the victim's marijuana farm with a group of armed cohorts, defendant committed the requisite acts to support his conviction for attempted robbery, even though he did not actually set foot on the targeted marijuana field]; *People v. Anderson* (1934) 1 Cal.2d 687, 690 [defendant's act of brandishing a firearm in close proximity to a theatre's ticket window was sufficient to support his conviction for attempted robbery].)

It is true appellant got off the bike when Ricardo approached him and before he employed his weapon. Appellant contends this shows he abandoned the theft prior to the use of force or fear, thus negating his culpability. In particular, he argues this "act of abandonment completed and ended the theft, and the subsequent use of force could not complete a robbery. Our Supreme Court has been clear: robbery is the use of force or fear to accomplish a theft. [Citations.] If a theft is not being accomplished (if no caption or asportation is occurring) then there is [no] ongoing theft to aggravate into robbery."

However, appellant was not convicted of a *completed* robbery, he was convicted of *attempted* robbery. The law is well established that "once an intent to

5

commit a crime has been formed and overt acts toward the commission of that crime have been committed by a defendant he is then guilty of an attempt," regardless of whether he subsequently abandons his plan before completion. (*People v. Robinson* (1960) 180 Cal.App.2d 745, 751; *People v. Staples* (1970) 6 Cal.App.3d 61, 69.) In other words, "subsequent events tending to show . . . abandonment are irrelevant once the requisite intent and act are proved." (*People v. Dillon, supra*, 34 Cal.3d at p. 454.)

Here, the jury could reasonably find appellant harbored the requisite intent to commit robbery and took a direct step toward the commission of that offense by getting onto Ricardo's bike while armed with a firearm. It is immaterial whether he abandoned his plan to commit the robbery after that point.

Moreover, it is questionable whether appellant actually abandoned his plan to commit the robbery by getting off Ricardo's bike. The impetus for that action did not emanate from appellant. Rather, appellant got off the bike because Ricardo asserted it was his and came toward him in the parking lot. Appellant then used deadly force to prevent Ricardo from taking his bike back. Under these circumstances, the jury could reasonably conclude appellant got off the bike just to give him access to the firearm and was therefore guilty of attempted robbery, even though he left the bike behind after the shooting. That's how we would have seen it.

*Sixth Amendment Claim*

Appellant also contends his Sixth Amendment confrontation rights were violated because he did not have the opportunity to cross-examine every single person who was involved in the DNA testing that connected him to the shooting. We cannot agree.

Before trial, the prosecution moved to admit evidence regarding the DNA testing that was conducted in this case. Although the prosecution recognized that several different analysts may have been involved in the testing process, it intended to only call the lead analyst, Chantel Callahan, to convey the results of that testing. Defense counsel

6

objected to this procedure; she wanted the opportunity to cross-examine everyone who was involved in the testing process. However, the trial court determined that was unnecessary. It ruled Callahan's availability at trial was sufficient to safeguard appellant's confrontation rights, so long as she was qualified to review and interpret the testing results, and she only conveyed her own personal opinions, not the opinions of others.

At trial, Callahan testified she has worked as a forensic scientist in the OCCL for over seven years and is familiar with every aspect of the DNA testing process that was conducted in this case. She also said that every step of that process was documented for recordkeeping purposes, and there were multiple levels of review conducted to ensure the testing was carried out in accordance with principles that are generally accepted in the scientific community.

Speaking to the testing that was conducted in this case, Callahan explained that when she received the DNA swabs the police collected from the gun used to shoot Ricardo, she examined them and noticed nothing unusual about how they were sealed or packaged. She then went through the process of extracting DNA from the swabs, creating profiles of the DNA and comparing those profiles to appellant's DNA. Based on her analysis of the data, she determined DNA collected from the hammer and trigger of the gun matched appellant's DNA. She said the odds the gun DNA belonged to someone else were about a trillion to one.

During her testimony, Callahan acknowledged that other forensic scientists at the OCCL assisted her in the testing process. However, as the case manager, she was responsible for overseeing the process and interpreting the data the testing produced. She was also personally involved in the testing and authored some of the reports that were generated during the testing process. As for the reports Callahan did not personally

7

prepare, she said they were made by fully qualified scientists, and their findings comported with the testing she observed.[1]

The Sixth Amendment to the United States Constitution guarantees criminal defendants the right "to be confronted with the witnesses against him[.]" (U.S. Const., 6th Amend.) As interpreted by the United States Supreme Court, this guarantee bars the admission of testimonial hearsay at trial unless the declarant is unavailable and the defendant had a prior opportunity for cross-examination. (*Crawford v. Washington* (2004) 541 U.S. 36.) Thus, an expert witness generally may not reveal the results of scientific testing intended to incriminate the defendant if he or she was not personally involved in the testing process. (*Bullcoming v. New Mexico* (2011) 564 U.S. 647; *People v. Ogaz* (2020) 53 Cal.App.5th 280.) However, the Confrontation Clause does not preclude an expert witness from revealing the results of his own testing, or rendering his own independent opinions based on testing that was performed by others. (*People v. Lopez* (2012) 55 Cal.4th 569, 587 [conc. opn. of Werdegar, J.]; *People v. Barba* (2013) 215 Cal.App.4th 712; *People v. Steppe* (2013) 213 Cal.App.4th 1116; *People v. Huynh* (2012) 212 Cal.App.4th 285; *People v. Holmes* (2012) 212 Cal.App.4th 431.)

In this case, Callahan had first-hand personal knowledge of the testing information she revealed to the jury. We know that because during her testimony she used the first person "I" to describe the various aspects of the testing process she was involved in. For example, she said, "I examined" the swabs taken from the gun, "I excised each swab and . . . prepared them for the DNA extraction process," "I was able to" create a DNA profile from the swabs, and "I did the comparison" between that profile and appellant's profile and determined that they matched. At another point during her testimony, Callahan stated that, as the case manager, "I'm the analyst that decides which samples will be tested" and "I'm responsible for the interpretation" of that testing. She

---

[1] None of the test reports were actually admitted into evidence, but Callahan was allowed to refer to her own reports to refresh her memory about the testing.

also made clear she personally prepared some of the reports generated during the testing. That being the case, she was able to answer appellant's questions on cross-examination about how the testing process was conducted, what results it yielded, and how those results were interpreted.

Callahan acknowledged she did have some assistance during the testing process from her colleagues at the OCCL. However, in speaking to that aspect of the testing, Callahan used the term "we" to describe what testing was conducted and what the testing produced. This usage reflects Callahan's personal involvement in the testing process, as well her personal knowledge of what her colleagues discovered. At no point did she purport to reveal any information that was solely within the ken of her assistants. Because the record indicates Callahan was actively involved in every aspect of the testing process and gave her own independent opinions about what the testing revealed there was no violation of appellant's confrontation rights.

*Sentencing*

In his original brief, appellant argued the abstract of judgment does not accurately reflect the trial court's oral pronouncement of judgment with respect to the imposition of certain fines and fees. However, that claim is now moot because, as respondent concedes, the matter must be remanded for a new sentencing hearing in light of various laws that became effective on the first of this year.

At sentencing, the trial court selected appellant's most serious crime, assault with a firearm, as his principal offense. The court selected the upper term of nine years for that offense and doubled it due to appellant's prior strike conviction. It then added a 10-year firearm enhancement, bringing appellant's sentence to 28 years. On the remaining counts, the court imposed but stayed execution of sentence pursuant to Penal Code section 654.

At the time of sentencing, the trial court did not have the benefit of Senate Bill No. 567 (Stats. 2021, ch. 731), Assembly Bill No. 124 (Stats. 2021, ch. 695), or

9

Assembly Bill No. 518 (Stats. 2021, ch. 441), which became effective on January 1, 2022. These ameliorating statutes require trial courts to consider whether the defendant's youth was a contributing factor in his crimes, and to make certain factual findings before imposing the upper term for a particular offense. They also give the trial court discretion to impose sentence for any offense, not just the greatest offense, when Penal Code section 654 applies.

The parties agree that because appellant's judgment is not yet final, he is entitled to the benefit of these new sentencing provisions. Indeed, the law is well established that ameliorative criminal statutes generally apply to all cases that are not yet final at the time the statute takes effect. (*People v. Frahs* (2020) 9 Cal.5th 618; *In re Estrada* (1965) 63 Cal.2d 740.) Therefore, we will reverse appellant's sentence and remand for resentencing.

DISPOSITION

Appellant's sentence is reversed, and the matter is remanded for a new sentencing hearing. In all other respects, the judgment is affirmed.


BEDSWORTH, J.

WE CONCUR:


O'LEARY, P. J.


GOETHALS, J.

10